UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | Case No.: 3:06cr158(SRU) |
| | : | |
| | : | |
| | : | |
| STANLEY SHENKER | : | April 27, 2007 |

### GOVERNMENT'S REPLY SENTENCING MEMORANDUM

The defendant is scheduled to be sentenced on May 1, 2007 at 10:00 am. The United States submits this memorandum in reply to defendant Stanley Shenker's sentencing memorandum, dated April 23, 2007. The parties agree that the applicable Guidelines range for imprisonment is 33-41 months.[1] The defendant seeks a sentence lower than the Guidelines range for several reasons: 1) he seeks a downward departure under the Guidelines in light of his purported medical condition, age and family circumstances, or combination of factors; and 2) he seeks a non-Guidelines departure for his medical condition; his family circumstances and family needs; his newly found purported willingness to part with ill-gotten gains; and that Bell's Guidelines are for various reasons slightly lower than Shenker's. The Government respectfully submits that Shenker's arguments for a lower sentence deserve short shrift. Shenker has a track record going back to 1998 of lying and shading the truth to get his way. His belated efforts to recast himself now as a changed, remorseful man for purposes of sentencing are both too late and unconvincing. The Government respectfully requests that the Court impose a Guidelines sentence in this case.

---

[1]  As part of his plea agreement, Shenker agreed to waive his right to appeal if the sentence imposed does not exceed 41 months' imprisonment and a three-year term of supervised release. The Government agreed not to appeal a sentence imposed within or above the 33 to 41 month Guideline range.

**BACKGROUND**

A.  Factual Background

The PSR and recent submission by the victim WWE, dated April 26, 2007, set forth the relevant factual background, which need not be repeated in detail here.  In brief, as noted in the PSR and the parties stipulation, defendant Stanley Shenker agreed with WWE employee James Bell to provide Bell with secret payments of approximately $950,000 in exchange for Bell ensuring that Shenker received a full commission on certain licenses from WWE.  PSR ¶ ¶ 13-16.  After Shenker was terminated from his licensing agreement with WWE, Shenker sought to disguise his kickback payments and caused false and fraudulent invoices to be furnished to WWE counsel during civil litigation.  *Id.* at ¶ 17.  Shenker knew that his actions in providing kickbacks to Bell and in seeking to disguise the payments as something else were illegal and would act to defraud WWE of the honest services of its employee, Bell.  *Id*. at ¶ 15.

B.  Procedural Background

The Government began its criminal investigation of Stanley Shenker and James Bell in March 2003.  Despite incontrovertible evidence that Shenker had paid Bell kickbacks and that Shenker repeatedly lied under oath to advance his civil case, Shenker developed a fanciful tale that he had not conspired with Bell to defraud WWE, but instead had been wrongly coerced by Bell into paying kickbacks.  This was a particularly amusing story for a host of reasons, including  that his friendship with Bell predated WWE, that Bell had enabled him to get the job at WWE, that he remained friends with Bell after both were fired by WWE (in fact, *Shenker worked in the same small office with Bell and rented office space to him* ), that Bell after the  firing helped Shenker falsify and manufacture evidence for Shenker's subsequent case against WWE, and that the two continued to split royalty payments after Bell was no longer with WWE.

Unlike Shenker, Bell relatively early on in the investigation acknowledged his involvement in the kickback arrangement and made efforts to make amends.  He agreed to cooperate in 2004 and entered a plea of guilty in February 2005, and made settlement arrangements with WWE, paying

WWE $2.5 million.  In his memorandum, Shenker attempts to paint himself as having always been remorseful and contrite and as someone who "assisted the WWE in [its] pursuit of [James] Bell." Def. Mem. at 8.  Nothing could be farther from the truth.  As early as 2004, Shenker was given every opportunity to plead guilty and fully cooperate against Bell.  He choose not to do so at that time. Rather, far from accepting responsibility, he tried to shift all the blame to Bell.   On April 7, 2005, Shenker met with the Government and agents to tell his story, the latest and newest version of events.   At that meeting, he methodically and repeatedly lied to the Government and the FBI.  He continued to spin his story that Bell had coerced him and that he, Shenker, was a poor, downtrodden victim incapable of criminal conduct.   When questioned  how Bell, no longer at WWE, "coerced" Shenker into lying and fabricating evidence to advance *Shenker's* civil case, Shenker blanched, stammered and ultimately had no response.  He, however, steadfastly maintained his innocence.

The grand jury originally indicted Shenker in a four count indictment in June 2006 charging conspiracy, and interstate transportation of money obtained by fraud arising out of Shenker's scheme to defraud World Wrestling Entertainment Inc. by paying kickbacks to a WWE employee, Bell.  A superseding indictment was returned in September 2006 adding one count of mail fraud for Shenker's act of causing his civil attorneys to mail phony invoices to WWE counsel during civil litigation.  Trial was scheduled to begin on January 22, 2007.

It was only in January 2007, when the Government had prepared for trial and had designated as trial exhibits the many and changing videotaped versions Shenker gave in the civil litigation of his story that Shenker made any attempt to accept responsibility for his actions.  Thus, Shenker's suggestion that he accepted responsibility in "early March 2003" when he corrected his deposition testimony (Def. Mem. at 8) is patently false.  Indeed, it was not until January 12, 2007 that Shenker entered a plea of guilty to the conspiracy count pursuant to a written plea agreement.  During his plea allocution, Shenker admitted for the first time in open court that he conspired with James Bell to defraud WWE of the honest services of its employee (Bell) through a kickback scheme in which Shenker split commissions with Bell totaling approximately $1.9 million.

## DISCUSSION

**A.      A Prison Sentence in the Range of 33-41 Months is Reasonable and Warranted.**

The parties agree that the correct imprisonment range under the Sentencing Guidelines is 33-41 months.    The PSR also calculates the applicable range as 33-41 months.  PSR¶ 66.    The applicable range was determined using the 2002 version of the U.S. Sentencing Guidelines Manual, and is based on the following calculations:  The base offense level under U.S.S.G. § 2B1.1(a)  is 6.  Sixteen levels are added under U.S.S.G. § 2B1.1(b)(1)(I) for the amount of the "loss" which is between $1.5 and $2.5 million.  Two levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility resulting in a total offense level of 20.  A total offense level of 20 with a criminal history category one results in a range of 33 to 41 months' imprisonment.  The PSR agrees with these calculations.  PSR ¶¶ 21-29.  Accordingly, the Government recommends that the Court impose a Guideline prison sentence within the range of 33 to 41 month.

A Guidelines sentence within that range is appropriate here.  Although the Sentencing Guidelines are no longer mandatory, they must be considered by the Court along with the other factors listed in 18 U.S.C. § 3553(a).  *United States v. Booker*, 543 U.S. 220, 260-61 (2005); *United States v. Crosby*, 397 F.3d 103, 110 (2d Cir. 2005).  Ultimately, a district court's sentence is reviewed for reasonableness.  *Booker*, 543 U.S. at 260-61; *Crosby*, 397 F.3d at 114-15.  Reasonableness is a flexible concept and district courts are given latitude in their exercise of discretion to fashion an appropriate sentence, even a non-Guideline sentence.  *See United States v. Jones*, 460 F.3d 191 (2d Cir. 2006).  But reasonableness does not result in unfettered discretion to ignore the Guidelines, and the Second Circuit has recognized post-*Booker* that the Guidelines remain highly instructive in determining a reasonable sentence.

Shenker seeks to downplay the significance of the Guidelines by suggesting they are just another factor for the Court to consider.  Def. Mem. at 5.  The Second Circuit has recently held in an appeal of a non-Guideline sentence that "[i]n calibrating our review for reasonableness, we will continue to seek guidance from the considered judgment of the Sentencing Commission as expressed

in the Sentencing Guidelines and authorized by Congress." *United States v. Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006).  In *Rattoballi*, the Second Circuit squarely rejected Shenker's suggestion that the Guidelines are just like any other factor the Court must consider.  Indeed, our Circuit noted the preeminence of the Guidelines among the 3553(a) sentencing factors, holding that they cannot be considered "just 'another factor' in the statutory list . . . because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges." *Id*. (citation omitted).  Accordingly, while noting that it has not adopted *per se* rules regarding its reasonableness review of sentences, the Second Circuit held in *Rattoballi* that:

> Nevertheless, on appellate review, we will view as inherently suspect a non-Guidelines sentence that rests primarily upon factors that are not unique or personal to a particular defendant, but instead reflects attributes common to all defendants. Disparate sentences prompted the passage of the Sentencing Reform Act and remain its principal concern.

*Id*. at 133-34.

In this case, there are no factors unique to defendant Shenker, as opposed to other first time white collar defendants, that would support a conclusion that a non-Guideline sentence is appropriate.  To the contrary, a Guidelines sentence would be eminently reasonable in this case, as it reflects the considered judgment of the Sentencing Commission, "an expert agency whose statutory charge mirrors the § 3553(a) factors that the district courts are required to consider." *Rattoballi*, 452 F.3d at 133.   Accordingly, Shenker should be sentenced to a term of imprisonment in the range of 33 to 41 months.

**B.     A Downward Departure for Shenker's Health and Age is Not Warranted.**

Shenker requests that the Court grant him a downward departure for his health.  Def. Mem. at 6-10.  Quite simply, a departure for health is not warranted under U.S.S.G. § 5H1.4 or as a matter of simple justice.   While the Government does not wish to minimize any defendant's assertion of medical limitations, this defendant, despite his maladies, continues to travel extensively throughout the United States, from New Canaan, CT, to West Palm Beach, FL, to Las Vegas, NV, to  New

Jersey and New York.  *See, e.g.*, Letter from Kirpatrick & Lockhart, dated April 3, 2007 (without attachments).[2]  This is not an individual unable to function because of medical limitations.  He also would not be the last defendant who might benefit from the restrictions on diet and stress that comes with the structured prison environment.

In addition, this defendant has a long history of embellishing facts when it suits his purposes. Even as to issues as potentially incontrovertible as medical condition, defendant's version is somewhat suspect.   By way of example, his bold claim in his sentencing memorandum that he "broke down" at his December 2002 deposition due to medical reasons (Def. Mem. at 7) is disingenuous at best.  As the videotaped deposition makes clear, Shenker only feigned illness *after* he was confronted with two sets of invoices – the original invoices used to pay kickbacks to Bell and the fraudulent invoices submitted by Shenker during the civil litigation.  It was after this dramatic confrontation and his realization that he had been caught in blatant multiple lies that he requested to end the deposition.

Even taking the extent of his claimed medical conditions at face value, § 5H1.4 makes clear "physical condition . . . is not ordinarily relevant in determining whether a departure may be warranted."   Under § 5H1.4, courts look for evidence regarding the Bureau of Prisons' ability to accommodate the conditions at issue.  For example, in *United States v. Studley,* 907 F.2d 254, 259 (1st Cir. 1990), the First Circuit held that a downward departure from incarceration to probation for health reasons is justified only where "the Bureau of Prisons does not have adequate treatment services." Similarly, in *United States v. Leblanc*, 24 F.3d 340, 348, (1st Cir. 1994), the district court denied a motion for a downward departure where the defendant had suffered two heart attacks prior to sentencing.  Significantly, in *LeBlanc*, the First Circuit upheld the decision and noted that there was no evidence that the Bureau of Prisons would be unable to adequately accommodate LeBlanc's medical needs.  *Id.*

---

[2]  The Government will submit the relevant supporting attachments at sentencing if requested by the Court.

The Second Circuit has elaborated that such exceptions will only occur in "extreme situations." *Sapia v. United States*, 433 F.3d 212, 219 (2d Cir. 2005).  This rules out most illnesses and other physical conditions.  For example, the Second Circuit has found that "a heart condition by itself is not necessarily a reason to depart downwardly under the Guidelines."  *United States v. Napoli*, 179 F.3d 1, 18 (2d Cir. 1999).   In accord with other Circuits, our Circuit has found that "a qualifying impairment is one that cannot be adequately cared for in the prison system." *United States v. Garcia*, 45 Fed. Appx. 21, 22-3; 2002 WL 1990335, 1 (2d Cir. 2002);  *see also United States v. Martinez*, 207 F.3d 133, 139 (2d Cir.2000); *United States v. Persico*, 164 F.3d 796, 806 (2d Cir.1999); *United States v. Altman*, 48 F.3d 96, 104 (2d Cir.1995).  Shenker has utterly failed to meet his burden to demonstrate that his physical condition can not be adequately addressed by the Bureau of Prisons, and has thus failed to prove that his medical condition is the  "extreme situation" warranting a departure.  Nothing submitted by any of Shenker's medical professionals even remotely suggests that Shenker can not receive adequate medical treatment in prison.

Thus, the critical question is not whether Shenker has a medical problem -- but rather, whether his medical problem can be treated in prison.  *See, e.g., United States v. Sherman*, 53 F.3d 782, 788 (7th Cir. 1995) (to depart downward court "must make a factual finding that the Bureau of Prisons is not able to care for [defendant's] medical problems" citing footnote that quotes the Department of Justice, A Judicial Guide to the Bureau of Prisons -- "There are virtually no medical problems that the Bureau's health care delivery system cannot respond to adequately, either within its institutions or on a contract consultant basis . . . .")  Shenker and his medical professionals have chosen to ignore this question.[3]

---

[3]   A sentence of imprisonment does not end the inquiry of whether Shenker's medical conditions can be addressed while he is in custody.  In the event the Bureau of Prisons concludes, after adequate investigation, that Shenker can not receive adequate medical attention, or that his condition has deteriorated beyond the Bureau of Prison's expertise, the Bureau of Prisons can remedy the situation. *See, e.g.*, 18 U.S.C. § 3582(c) (Bureau of Prisons may move the district court to reduce the term of imprisonment for extraordinary and compelling reasons, including needed medical care as set forth in 18 U.S.C. § 3553(a)(2)(D)).  Thus, a decision to incarcerate Shenker at this time does not prevent a release from custody in light of additional medical information.

Nor is Shenker entitled to any departure based on his age. Not only is age a discouraged departure ground, but the defendant is not elderly. He is only 64. The Guidelines state that "age may be a reason to impose a sentence below the applicable guideline range when the defendant is elderly <u>and</u> infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." U.S.S.G. § 5H1.1 (emphasis added). The defendant is not, however, infirm as he continues to travel and engage in business pursuits. The Government respectfully submits that neither a Guidelines departure nor a non-Guidelines sentence is appropriate on these grounds.

### C.      Shenker's Employment Record and Family Ties Are Not Extraordinary.

Shenker also requests a departure based on his employment history and families ties. Def. Mem. at 10-12. Under the Sentencing Guidelines, a defendant's employment record and family ties "are not ordinarily relevant" in determining whether a departure is warranted. *See* U.S.S.G. §§ 5H1.5, 5H1.6. Only in "extraordinary circumstances" is a departure based on family ties permitted. *See United States v. Smith*, 331 F.3d 292, 294 (2d Cir. 2003).

The defendant's family circumstances are simply not extraordinary. He has a wife and two daughters aged 31 and 34. *See* PSR ¶¶ 38-39. The younger one lives in a group home. *Id*. Shenker maintains phone contact with his children.

As our Circuit and numerous other courts have recognized, all custodial terms of imprisonment impose a hardship on important family responsibilities. *See United States v. Sprei*, 145 F.3d 528, 534 (2d Cir. 1998) (vacating departure where religious father's incarceration would impact children's marriage prospects); *United States v. Headley*, 923 F.2d 1079, 1083 (3d Cir. 1991); *United States v. Cacho*, 951 F.2d 308, 311 (11th Cir. 1992); *United States v. Daly*, 883 F.2d 313, 319 (4th Cir. 1989); *United States v. Brewer*, 899 F.2d 503, 508 (6th Cir. 1990). As explained by the Second Circuit in *United States v. Sprei*, 145 F.3d at 534:

> Family ties and responsibilities are a discouraged basis for departure. *See* U.S. Sentencing Guidelines Manual § 5H1.6 policy statement. This is because "many defendants shoulder responsibilities to their families....

8

> Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration." *United States v. Johnson*, 964 F.2d 124, 128 (2d Cir.1992). The presence of a hardship resulting from imprisonment is therefore ordinarily not enough to warrant a departure. It is only "[e]xtraordinary circumstances ... not capable of adequate consideration .... [that] may constitute proper grounds for departure." *Id.* In other words, only if a district court finds the hardship to be exceptional may it downwardly depart on that basis. *See United States v. Galante*, 111 F.3d 1029, 1034 (2d Cir. 1997).

All families suffer when a loved one commits a crime. Shenker's attempt to pull at the Court's heart strings by implicitly suggesting that he cannot be incarcerated since his family needs him is hardly atypical. There is nothing exceptional or extraordinary about Shenker's family circumstances to separate Shenker from other white collar defendants facing incarceration who have the loving support of family members. In any event, the hardship caused by the defendant's incarceration, even within the Guideline range of 33-41 months, will not be of long duration or particularly severe. *See United States v. Faria*, 161 F.3d 761, 763 (2d Cir. 1998) (holding that downward departure was not warranted from Guidelines range of 21-27 months where recently-divorced defendant provided some financial support to ex-wife and children aged 10, 11, and 13). Shenker has nobody but himself to blame for his present circumstances. If anything, the obviously close and extended Shenker family has the ability, numbers and support to weather his absence. Therefore, this motion for a downward departure should be denied. Shenker is not entitled to a departure on this discouraged basis.

**D.      No Basis for Any Combination of Factors Departure.**

Shenker also suggests that he seeks a combination of factors departure in light of his age, medical condition and family circumstances. Def. Mem. at 6-7. The Sentencing Commission has acknowledged that in *extremely rare* cases, where numerous factors and circumstances are present, a departure may be warranted even though no one factor or circumstance, standing alone, would justify a departure:

> The Commission does not foreclose the possibility of an *extraordinary case* that, because of a combination of such characteristics or circumstances, differs significantly from the

> "heartland" cases covered by the Guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case. *However, the Commission believes that such cases will be extremely rare.*

U.S.S.G. § 5K2.0, commentary (emphasis added); *see United States v. Volpe*, 224 F.3d 72, 78-79 (2d Cir. 2000) (district court properly refused to depart downward on basis of combination of defendant's efforts to exonerate supposedly innocent man and inculpate another, and other factors claimed to make Guidelines sentence unusually harsh); *United States v. Payton*, 159 F.3d 49, 61-62 (2d Cir. 1998) (district court abused discretion in departing downward based on combination of defendant's lack of positive role models as a youth, history of drug abuse and failed treatment, possible ineligibility for credit for pretrial detention, and learning disability).

Shenker's circumstances are neither "extraordinary" nor "extremely rare." In fact, in the world of white collar fraud prosecutions, Shenker's situation and the arguments he raises in his memorandum are the norm, not the exception. As discussed above, none of the enumerated departure grounds on their own merits supports a downward departure. Those grounds are no more persuasive when viewed in combination. Shenker has failed to show why, in light of the combination of factors he cites, he merits a sentence lower than that set by the Sentencing Commission. Nor has he adequately explained how a downward departure "to avoid a prison sentence" (Def. Mem. at 18) can be squared with the need "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to promote respect for the law." 18 U.S.C. § 3553(a)(2)(A)&(B). In consequence of these failures, a downward departure based on a combination of factors is inappropriate.

Shenker is simply not entitled to a departure by combining many weak departure requests,

**E.**    **Other Factors Do Not Support Lower Sentence**

The defendant has pointed to two other grounds, presumably to make some type of non-Guidelines argument for leniency. Neither of these grounds justify a non-Guidelines sentence. First, the defendant appears to seek credit for his apparent willingness to part with ill-gotten gains

– monies that are already subject to attachment in the pending state court action that he has up to this date fought repaying to the victim.   As explained in the victim's recent submission,  the defendant has not made any payment to date or made any real effort to move the ball forward after the initial gesture.  Victim Letter, dated April 26, 2007, at 13.

Second, the defendant appears to seek a non-Guidelines sentence to reflect the lower Guidelines sentence applicable to James Bell.   Def. Mem. at 16.   Shenker was charged with, and pled guilty to, a crime that lasted until March 2003 and included Shenker's effort to defraud WWE of millions of dollars in a civil lawsuit.   Thus, the 2002 Manual is the correct book for Shenker's crime.   Bell, on the other hand, pled guilty to a mail fraud charged that indicated that his scheme ended in or about October 2000.   Thus, the 1998 Manual is the version used by Probation in connection with Bell's sentencing due to ex post facto concerns.[4]   The defendant does not dispute that, legally, different books apply.   As important, the use of different  books is fundamentally fair. Although Bell plainly assisted Shenker in illegal acts after October 2000, the heart of Bell's criminal conduct was actions  taken prior to October 2000, when Bell was employed by WWE.   Shenker in marked contrast continued undaunted after his relationship with WWE terminated.   Shenker  filed

---

[4]    In *United States v. Demaree*, 459 F.3d 791 (7th Cir. 2006), the Seventh Circuit held that, in the wake of *Booker* rendering the Guidelines advisory, a change to the Guidelines Manual that increases the Guidelines range for a crime is not an ex post facto law, and it may be applied to a defendant who committed the crime before the change.   *Id.* at 792, 795.   The Seventh Circuit added that the sentencing judge could accomplish the same result under section 3553(a):

> a rule that a guidelines change cannot be applied retroactively if it would be adverse to the defendant would have in the long run a purely semantic effect.  Instead of purporting to apply the new guideline, the judge who wanted to give a sentence based on it would say that in picking a sentence consistent with section 3553(a) he had used the information embodied in the new guideline.   For when the Sentencing Commission changes a guideline, it does so for a reason; and since it is a body expert in criminal punishments, its reason is entitled to the serious consideration of the sentencing judge.  A judge who said he was persuaded by the insight that informed the new guideline to give a sentence within the range established by it could not be thought to be acting unreasonably.   So to the other reasons for rejecting the ex post facto argument we add futility:  whenever a law or regulation is advisory, the judge can always say not that he based his sentence on it but that he took the advice implicit in it.   A judge is certainly entitled to take advice from the Sentencing Commission.

*Demaree,* 459 F.3d at 795.

11

the lawsuit in 2000 so that he alone could profit and then fabricated documents and repeatedly lied in depositions in 2002.[5]

Moreover, any disparity between Shenker and Bell that may result at the end of the sentencing process will be based on appropriate considerations.   While Shenker indicates that he "confessed" in his deposition testimony (Def. Mem. at 8), it was not until many years later (January 2007) that Shenker agreed to plead guilty.  Thus, unlike Mr. Bell who agreed to cooperate and pled guilty by early 2005, Mr. Shenker was not entitled and should not receive a third point for acceptance of responsibility.  Indeed, the difference between Mr. Bell's guideline range (30 to 37 months) and Mr. Shenker's guideline range (33 to 41 months) reflects, in part,[6] the timing of their respective decisions to acknowledge their culpability and enter a guilty plea.

Furthermore, if the Court does choose to reward Bell for his cooperation with the Government, that fact does not mean that Shenker deserves a break to achieve parity with his coconspirator.  Those disparities are often a function of the different treatment of defendants who cooperate and those who do not.  As the Eighth Circuit has explained in a case involving a drug conspiracy  - - which is equally applicable to the white collar conspiracy here:

> [T]here is a logical explanation for the shorter sentences imposed upon the other criminals involved in the drug conspiracy. . . .  Unlike Ponce, [other] defendants cooperated with the government.  As a result, the government filed downward departure motions on behalf of these defendants, and they received lower sentences.  Because the differences between Ponce's sentence and the sentences of these defendants arose from the plea bargaining process, they are not a proper basis for a reduction.

*Ponce v. United States*, 311 F.3d 911, 914-15 (8th Cir. 2002).

## F.   Weighing the Section 3553 Factors Support a Prison Sentence.

Title 18, United States Code, Section 3553(a) provides, in pertinent part, that:

> (a) Factors to be considered in imposing a sentence.--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set

---

[5]   Shenker turned down an offer of $5 million to settle the case before the WWE discovered Shenker's fraud.  Bell would have received none of the settlement money nor any of the money that Shenker could have been awarded at the end of the civil litigation.

[6]   Unlike Bell, Shenker did not receive an enhancement for abuse of position of trust.

forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed–

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

***

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

For the reasons discussed above, Shenker's conduct, weighed in view of the factors set forth in Section 3553(a), call for a sentence of imprisonment consistent with the terms recommended by application of the Sentencing Guidelines, a sentence in the range of 33 to 41 months. *See* 18 U.S.C. § 3553(a)(4) (Court shall consider the sentence applicable under the Guidelines).

**1. The Nature and Circumstances of the Offense.**

Shenker's criminal conduct, conspiring to defraud WWE of the right to the honest services of its employee by paying almost $1 million in kickbacks and creating phony invoices in civil litigation is a serious and costly offense. By any measure, the seriousness of Shenker's illegal conduct and his attempt to obstruct civil litigation, warrant a substantial prison sentence. The Government respectfully submits that this factor warrants a sentence consistent with the Sentencing Guidelines.

Shenker's claim that the WWE made millions of dollars from his work misses the point. Def. Mem. at 17. Shenker could have earned millions of dollars for legitimate efforts, but plain

13

greed led him to try to fix the business to go his way.   Plain greed led him to sue WWE for even more money *after* he had already set himself up for huge paydays by his kickbacks to Bell.  The point is not that WWE made money on licensing deals – this would have happened with or without Shenker -- it is that Shenker may have cost WWE millions of dollars by irretrievably corrupting Bell.

      2.  **History and Characteristics of Shenker.**

Although Shenker, like virtually all white collar offenders, does not have a prior conviction, there are many important facts about his history and characteristics that merit consideration.  First, the duration of his criminal conduct shows that Shenker's criminal conduct was not isolated or aberrational.   Shenker, at the very least, knowingly engaged in fraudulent conduct over a period of years without regard to his supposed integrity and business ethics. Second, Shenker's criminal conduct was not born out of any real economic necessity, deprived upbringing or lack of formal education and opportunity.   His employment opportunities and overall wealth  permitted Shenker to decline to engage in a kickback scheme.

The numerous letters in support of Shenker submitted by family, friends and business associates are the norm rather than the exception in white collar cases.  "[E]xcellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her."  *United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003). "[W]e expect the district courts to view such evidence with the skepticism of experience in sentencing executives who commit white-collar offenses."  *Id.*

      3.  **The Sentence Must Promote Respect for the Law**.

The sentence in this case must reflect the seriousness of the offense committed by Shenker, and provide a message of deterrence to all white collar professionals who are thinking of defrauding companies or obstructing civil litigation.   Prison need be imposed in these type cases. Such a sentence would demonstrate that those who defraud companies and thereafter,

cover up their fraud in civil litigation are punished with something more than a proverbial slap on the wrist and an order not to do it again.   It is rather axiomatic that the sentence in this case be long enough to reflect the fact that Shenker's criminal conduct was a lengthy and serious offense. As it is, a Guidelines sentence of incarceration would still be shorter than the years Shenker defrauded WWE.   The sentence must be significant enough to promote public respect for the law.

### 4.  __The Court Should Consider General Deterrence.__

One of the factors the Court must consider in imposing sentence is the need for the sentence to "afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(B).  A prison sentence for such conduct can serve as a powerful deterrent against the commission of lucrative financial crimes by persons who, like Shenker, seek to avoid any incarceration.

As this case shows, there can be a huge financial incentive to engage in a kickback scheme which serves to defraud a company of the honest services of one of its high level employees.  Through his relationship with Bell and WWE, Shenker reaped millions of dollars in commissions.  White collar professionals make daily decisions that affect the companies with whom they do business.  As recent performance will attest, each of these professionals is capable of telling the truth or of engaging in fraudulent and deceptive actions.  Unless these white collar professionals, like Shenker, truly understand that there are serious and certain consequences for their actions, the temptation to defraud others cannot be tempered, let alone, eliminated.  It is only when these professionals see other similarly situated professionals, such as Shenker, go to jail for some period of imprisonment, that these persons will think twice before deciding to engage in kickback schemes.  General deterrence serves an important function and works, perhaps even more effectively than in the context of other types of criminal conduct, to prevent financial crimes of the sort committed by Shenker.

Shenker suggests that no term of imprisonment is  necessary.  Def. Mem. at 18.  Such a suggestion implies that white collar felons such as himself are peculiarly sensitive to the

ignominy of conviction and, therefore, the fear of conviction alone, without a prison sentence, is sufficient to achieve general deterrence.  This argument should be rejected.  First, recent history has shown that the risk of a felony conviction alone has not been sufficient to deter corporate executives who are tempted to put their personal financial interests above their legal and fiduciary duties to make full and truthful disclosures to their shareholders.  *See* Kroger, "Enron, Fraud, and Securities Reform: an Enron Prosecutor's Perspective," 76 U. Colo. L. Rev. 57, 110 (Winter 2005)(noting that low sentences traditionally handed down to white collar defendants under the Sentencing Guidelines failed to adequately deter corporate crime).

Second, Shenker's implicit suggestion, at its core, relies on premises inimical to basic principles of equal application of the laws.  Shenker contends that he should receive no jail time because he "has lost everything material" as a result of the investigation and prosecution of this case.  Def. Mem. at 17.   According to this logic, one who is educated and highly regarded should not be sent to jail for committing the same crime that would justify a sentence of imprisonment for a less well-heeled and well-regarded defendant.  This argument turns on its head the notion that from those who have the greatest advantages in life, the most is properly expected.  The Court should reject the notion that white collar professionals (like Shenker) should be sentenced more lightly than the poor and powerless because, for the former, the embarrassment of conviction alone (without any prison sentence) is more devastating than it would be for those who have enjoyed fewer advantages in life.  Indeed, the author of a survey of academic research regarding the efficacy of criminal sanctions for white collar crimes had this to say:

> White-collar crime is believed to be particularly amenable to deterrence due to its rational and profit-oriented motivation.  In a conceptual analysis of the topic, Braithwaite and Geis observed that white-collar offenders are not committed to a lifestyle of illegality, are risk aversive, and have more to lose as a result of a criminal conviction than street offenders.  Elsewhere Geis noted that "[j]ail terms have a self-evident deterrent impact upon corporate officials, who belong to a social group that is exquisitely sensitive to status deprivation and censure."  It is generally perceived that executives exhibit distress at the thought of being sentenced to incarceration: "It results in hypertension, it causes heart attacks, it is very serious."

> Most judges and prosecutors view general deterrence as the one of
> the goals, if not the major purpose, in sentencing white-collar
> offenders. Punishment should serve to discourage others from
> committing similar offenses and jail or prison sentences, judges
> and scholars alike tend to believe, are particularly effective as a
> general deterrent.

Elizabeth Szockyj, "Imprisoning White-Collar Criminals?", from "Symposium: A Fork in the
Road Build More Prisons or Develop New Strategies to Deal with Offenders," 23 S.Ill.U.L.J.
485, 492 (1999)(footnotes omitted); *accord* James J. Fishman, "Enforcement of Securities Laws
in the United Kingdom," 9 Int'l Tax & Bus. Law. 131, 170 (1991) ("Though it may be small
satisfaction to defrauded investors, incarcerating perpetrators of financial misdeeds serves an
important deterrence to future violators.  The certainty of enforcement and prison for white collar
criminals is an effective deterrence."); Jennifer S. Recine, Note, "Examination of the White
Collar Crime Penalty Enhancements in the Sarbanes-Oxley Act," 39 Am. Crim. L. Rev. 1535
(Fall, 2002).

## G.     Full Restitution is Mandatory and Should Be Ordered.

### 1) The Statutory Framework

As part of the plea agreement, Shenker agreed to make full restitution to the victim of his
crime in the amount determined by the Court.  Restitution is mandatory here in any event, so the
Court should impose an order of restitution in favor of  Shenker's victim (WWE).  18 U.S.C. §
3553(a)(7).

Under the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A and 3664,
this Court is required to impose an order of restitution in this case in favor of the victim of the
defendant's crime for the full amount of its losses, without consideration of the defendant's
ability to pay that amount.  18 U.S.C. § 3664(f)(1)(A) ("In each order of restitution, the court
shall order restitution to each victim in the full amount of each victim's losses as determined by
the court and without consideration of the economic circumstances of the defendant."); *see*
*United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir. 2004); *United States v. Johnson*, 378 F.3d 230,
244-45 (2d Cir. 2004); *see also* U.S.S.G. § 5E1.1 (directing the sentencing court to enter a

restitution order if there is an identifiable victim).

Additionally, in a case such as this where

> more than one defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.

18 U.S.C. § 3664(h); *see United States v. Boyd*, 222 F.3d 47, 51 (2d Cir. 2000)(affirming an order which required the defendant to pay restitution in the full amount of the victims' losses caused by the conspiracy as a whole, even with regard to losses caused by conduct that was the subject of substantive counts as to which the defendant was either not charged or acquitted). This provision confers substantial discretion upon the sentencing court to decide whether to impose full or joint and several liability for restitution on each defendant. *United States v. Nucci*, 364 F.3d 419, 422 (2d Cir. 2004); *United States v. Lucien*, 347 F.3d 45, 54 (2d Cir. 2003); *cf. United States v. Klein*, et al., Docket Nos. 05-3443-cr(L), 05-4199-cr(CON), decided February 5, 2007 (2d Cir.) (restitution order remanded where district court precluded joint and several liability and restitution orders exceeded victim's losses).

The requirement for mandatory restitution under the MVRA does not apply only if:

> the court finds, from facts on the record, that--

> (A) the number of identifiable victims is so large as to make restitution impracticable; or

> (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

18 U.S.C. § 3663A(c)(3).  As discussed below, mandatory restitution will apply in this case as to material aspects of loss.

The Court must also fix a schedule for payment of restitution, and in so doing, must consider the following statutory factors:

> (A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;

18

        (B) projected earnings and other income of the defendant; and

        (C) any financial obligations of the defendant; including obligations to
            dependents.

U.S.C. § 3664(f)(2).[7]  If the Court intends to establish a schedule of periodic payments, it must

expressly and clearly, as the failure to set forth such a schedule creates a presumption that the

entire restitution amount is payable immediately.  *Nucci*, 364 F.3d at 421 (citing 18 U.S.C.

3572(d)(1)).  Nonetheless, in cases where a periodic payment schedule is established, the

payment schedule must "be the shortest time in which full payment can reasonably be made."  18

U.S.C. § 3572(d)(2).

      Where, as here, Shenker has the capacity for employment during the term of

imprisonment through enrollment in the Bureau of Prisons' Inmate Financial Responsibility

Program ("IFRP") (28 C.F.R. §§ 545.10-11), the defendant should be required to commence

payment immediately.  *See United States v. Mortimer*, 94 F.3d 89, 91 at n. 2 (2d Cir. 1996)("We

note that a district court could properly draw upon the IFRP guidelines stated in the Code of

Federal Regulations in fashioning an order of restitution that specifies the amounts to be paid, so

long as discretionary authority to depart from the court's order is not vested in prison officials.").

The defendant will have an even greater capacity for future employment at the conclusion of his

term of imprisonment, and thus the sentencing court should  also properly consider his potential

future earnings in fashioning an appropriate payment schedule.  *United States v. Lino*, 327 F.3d

208, 210 (2d Cir. 2003)("An order of restitution, if fashioned on a delayed schedule, will call for

payment at times far in the future.").  That such a schedule necessarily involves some guesswork

on the part of the court regarding the defendant's future income is no impediment to the court

making a reasonable prediction, based on information available at sentencing, regarding the

---

[7]     Although the sentencing court "need not make detailed factual findings on each factor, the record
must disclose some affirmative act or statement allowing an inference that the district court in fact
considered the defendant's ability to pay." *Lucien*, 347 F.3d at 53  (internal quotation marks
omitted).  The sentencing court may not satisfy this requirement merely by stating that it has
reviewed information regarding the  defendant's financial condition set forth in the pre-sentence
report. *United States v. Tran*, 234 F.3d 798, 812-14 (2d Cir. 2000), *overruled on other grounds,
United States v. Thomas*, 274 F.3d 655 (2d Cir. 2001).

amount of that income.  *Id.*; *United States v. Ismail*, 219 F.3d 76, 78 (2d Cir. 2000); *United States v. Atkinson*, 788 F.2d 900, 902 (2d Cir. 1986); *see  also United States v. Kinlock*, 174 F.3d 297, 300 (2d Cir. 1999)("a defendant's present financial situation does not eviscerate the district court's discretion to order restitution.").

       In fashioning a payment schedule that properly takes into account the defendant's personal expenses, the courts in this Circuit have frequently required the defendant to pay a percentage of his post-incarceration income as restitution.  *See* 28 U.S.C. §§ 3002(3)(B) and (9) and § 3205, which provide that the United States is entitled by law to obtain a wage garnishment in an amount equal to twenty-five percent (25%) of the defendant's net income to enforce payment of a criminal debt.[8]  *See also  United States v. Fiore*, 381 F.3d 89, 98 n.9 (2d Cir. 2004) (sentencing court required the defendant to pay monthly installments following his release from incarceration; each monthly installment was based upon a formula which imposed a graduated percentage of his earned income based on the income amount); *United States v. Walker*, 353 F.3d 130, 132 (2d Cir. 2003) (sentencing court required the defendant to pay ten percent of his gross monthly earnings toward restitution during the 3 year period of supervised release); *United States v. Jaffe*, 314 F.Supp.2d 216, 226 (S.D.N.Y. 2004)(requiring the defendant to pay the greater of $150,000 or fifteen percent of his post-tax annual income on a monthly basis).[9]  Additionally, where the restitution amount is so high that the defendant is unlikely to be able to pay it in

---

[8]    These provisions of the Federal Debt Collection Procedures Act ("FDCPA"), 28 U.S.C. § 3001 et seq. put the United States on equal footing with commercial creditors who may also obtain a garnishment of 25% of the defendant's net income through state remedies.  *See* C.G.S. § 52-361a(f).

[9]    The Court may consider assets not wholly owned by the defendant. 18 U.S.C. § 3664(f)(2)(A). The Court may also take into account assets potentially available to the defendant but which he voluntarily transferred to close family members after the fraud came to light in fashioning the appropriate payment schedule.  Although the Court may not require the defendant or a non-party to sell assets that are otherwise protected by law against alienation in order to make restitution payments, the Court need not reduce the scheduled payment amounts so as to permit the defendant or his transferees to maintain ownership and possession of those assets.  The defendant and his transferees are then left with the decision about whether or not to liquidate those assets in order to fulfill the defendant's restitution obligations, or to require the defendant to meet the restitution obligations from some other source. *Jaffe*, 314 F.Supp. at 226-28; *cf. United States v. Ismail*, 219 F.3d 76, 78 (2d Cir. 2000)(affirming a restitution order over a defense claim that he was indigent, with limited earning potential, and noting the "potential earnings" of the defendant's spouse).

installments during the period of supervised release, the United States, on behalf of the victim, or the victims themselves may move for collection of the balance of the restitution by way of a civil action. 18 U.S.C. § 3664(l) and (m); *United States v. Walker*, 353 F.3d 130, 133 (2d Cir. 2003)(*citing* 18 U.S.C. § 3664(m)(1)(B); *United States v. Savis*, 102 F.Supp.2d 514, 518 & n.5 (D.Vt. 2000); *see generally United States v. Porter*, 90 F.3d 64, 69-70 (2d Cir. 1996).

The MVRA requires that the Court determine identifiable victim losses no later than ninety days after the sentencing.  18 U.S.C. § 3664(d)(5).

### 2)  Restitution Applicable in this Case.

#### a)  Commissions Splitting Scheme

The Government submits that the Court should determine that the amount of restitution is at least the $1.9 million that Shenker obtained from WWE in which he kick-backed half the money to Bell.  It should also be noted that Shenker's coconspirator (Bell) has paid WWE approximately $2.5 million to resolve civil litigation.  Both Bell and WWE consider this payment to include Bell's share of restitution to WWE for monies Shenker kicked back to Bell ($950,000), as well as additional monies Bell paid to WWE to resolve pending state law claims.   Thus, if the Court treats that payment to WWE as constituting Bell's one-half share of the $1.9 million, the restitution owed by Shenker would be the remaining $950,000.  Shenker does not object to this restitution figure.

#### b)  Other Commissions Paid

WWE argues for restitution in the amount of $5,970,317.17 relating to commissions paid to Shenker after he began paying Bell kickbacks, which would include the $1.9 referenced *supra* at (a).   The theory for this recovery appear to be a breach of contract argument that WWE need not pay Shenker commissions if Shenker engaged in any act of fraud, theft, deceit, or unethical conduct. *See* Victim Letter, dated April 26, 2007, at 15.  The contract plainly gives WWE the right to terminate payments of all future commissions upon written notice to Shenker – whether or not Shenker had otherwise legitimately obtained a particular licensing contract for WWE and not

paid any kickback relating to that contract.   Even putting aside issues of contract interpretation (e.g., whether the entitlement to future commissions ended with the fraudulent act itself, the formal termination of the Agreement, or written notice of such termination),  it remains an complicated issue what loss flowed from defendant's illegal acts as to licensing contracts not directly subject to the kickback arrangement.   As a result, the Government respectfully requests the Court not impose restitution for other commissions paid because determining complex issues of fact relating to the cause or amount of this aspect of WWE's loss would complicate or prolong the sentencing process to a degree that the need to provide restitution to the victim is outweighed by the burden on the sentencing process. 18 U.S.C. § 3663A(c)(3).[10]

### c)  Legal Fees

For the reasons stated in the Victim Letter, dated April 26, 2007, the Government respectfully requests the Court include in restitution those attorney's fees and costs incurred by WWE up to the date in March 2003 that the defendant arguably recanted, namely, $1.914 million. There has been a sufficient and reasonable showing that the defendant proximately caused at least those fees and costs by lying and fabricating evidence to further his illegal acts, namely concealing the illegal kickback arrangement and thereby continuing his receipt of monies to which he was not entitled.

### CONCLUSION

For the foregoing reasons, the Government requests that the Court sentence defendant Stanley Shenker to a term of imprisonment within the applicable Guideline imprisonment range.  The Court should also order Shenker to pay restitution to the WWE, the victim of his criminal conduct.

---

[10]   Similarly, in its victim letter, WWE notes certain payments he received from Trinity that he did not share with Bell. Victim Letter, April 26, 2007 at 17. The Government has not included in its restitution figure the particular Trinity payment that was *not* split with Bell, treating that payment as independent and apart from the charged conspiracy.

Respectfully submitted,

JOHN H. DURHAM
DEPUTY UNITED STATES ATTORNEY


RICHARD J. SCHECHTER
SENIOR LITIGATION COUNSEL
Federal Bar No. CT 24238
915 Lafayette Boulevard
Bridgeport, CT 06604
Richard.Schechter@usdoj.gov
(203) 696-3049
(203) 579-5550 (Fax)


CHRISTOPHER W. SCHMEISSER
ASSISTANT U.S. ATTORNEY
Federal Bar No. CT 14806
157 Church Street, 23d Floor
 New Haven, CT 06510
Christopher.Schmeisser@usdoj.gov
(203) 821-3700
(203) 773-5378 (fax)

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 27, 2007, a copy of the foregoing was filed electronically, by facsimile and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System. The foregoing has also been sent by facsimile to: A true and correct copy of the foregoing Memorandum was forwarded by facsimile and U.S. mail, postage prepaid, to the following counsel on this the 27th day of April, 2007:

Andrew Bowman, Esq.
Counsel for defendant Stanley Shenker
1804 Post Road East
Westport, Connecticut 06880


Christopher W. Schmeisser
Assistant U.S. Attorney