# K&L|GATES

Kirkpatrick & Lockhart Preston Gates Ellis LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA  15222-2312

T 412.355.6500      www.klgates.com

**Jerry S. McDevitt**
Direct   412.355.8608
Fax      412.355.6501
jerry.mcdevitt@klgates.com

April 26, 2007

Honorable Stefan R. Underhill
District Court of Connecticut
915 Lafayette Boulevard
Bridgeport, CT 06604

> Re:   **United States v. Stanley Shenker; Docket No. 3:06 CR 158 (SRU) and**
> **United States v. James K. Bell; Docket No. 3:05 CR 29 (SRU)**

Dear Judge Underhill:

Our firm represents World Wrestling Entertainment, Inc. ("WWE") and we hereby submit this Victim Impact Statement on behalf of WWE in connection with the sentencing of Mr. James Bell ("Bell") and Mr. Stanley Shenker ("Shenker"). In doing so, we have had the opportunity to review Shenker's Sentencing Memorandum, which we believe does not comport with the facts in the respects demonstrated herein.

Previously, by letter dated February 8, 2007 to Mr. Joseph Zampano, we provided certain preliminary information on our views on restitution. It is our understanding that this letter, and attachments, were provided to the Court. As set forth in our February 8 letter, the financial damages to WWE caused by the dishonest services scheme are very substantial, especially when the damages associated with the videogame license are considered. Quite candidly, the damages associated with the videogame license are beyond the ability of either man to repay. For purposes of sentencing and restitution, therefore, we respectfully submit that the actions of both men once their crimes became known should be a central consideration. The actions of both men since that point are dramatically different.

Bell willingly accepted responsibility, both civilly and criminally, for his actions. Following the entry of his plea of guilty, he paid WWE $2.5 million to settle certain state law claims and promised full and complete cooperation even though doing so may expose him to additional liabilities. In sum, Bell has done all he can do financially to remedy the harm to WWE, promised truthful cooperation, and shown genuine remorse for his actions.

# K&L|GATES

Honorable Stefan R. Underhill
April 26, 2007
Page 2


In sharp contrast, Shenker continued his unrelenting criminal conduct even after his criminal conduct and original obstruction of justice were exposed.  He caused, and continues to cause, WWE to spend money on the fraudulent litigation he commenced during which he engaged in multifaceted obstruction of justice more fully described by the Honorable Chase Rogers in an Opinion found at <u>Stanley Shenker and Assocs., Inc. v. World Wrestling Federation Entertainment, Inc.</u>, 844 A.2d 964 (Conn. Super. Ct. 2003) ("Judge Rogers' Opinion").  Prior to his plea, Shenker never offered to pay WWE a dime for the harm he caused WWE or to settle the fraudulent civil suit, even after it was denounced as a fraud on the Court.  <u>Id.</u> at 977.  Recently, Shenker offered, by letter dated March 26, 2007 attached to his Sentencing Memorandum, to make restitution to WWE in amounts far less than the damages attributable to his criminal conduct.  Several efforts to discuss that offer with Shenker's counsel have not been successful to date.  Shenker has never cooperated with WWE.  Instead, he has just replaced one lie with other lies.  Despite having engaged in conduct that, if exposed, would embarrass most people, Shenker's only remorse is that he got caught and his actions are vindictive towards WWE for exposing his crimes.  Even now, and as is evident from his Sentencing Memorandum, Shenker tries to portray his conduct as benefiting WWE, not harming WWE.[1]

In order to fully comprehend the magnitude of Shenker's conduct and why WWE believes that he deserves a stiff sentence, we must first describe the harm done to WWE by the underlying criminal conduct and the means employed to cover it up.  Based on counsel's intimate knowledge of the facts derived from years of litigation regarding the matter, it is our firm belief that the architect of the criminal scheme was Shenker and that his participation in the illegal conspiracy is ongoing and not abandoned.

---

[1]     Emblematic of this is the suggestion that Shenker's efforts placed "staggering" amounts of money in WWE's coffers.  See Sent. Memo., p. 15.  As Shenker well knows, the two licenses on which Shenker relies—the toy license and the videogame license—were extremely valuable licenses which were bound to, and should produce, millions of dollars to WWE.  In reality, WWE received dramatically less than it should have received and would have received had Shenker and Bell not accepted bribes from Jakks and otherwise violated their fiduciary duty.  Instead, Shenker promised Bell that he would kickback half of his commission for Bell's assistance in steering licensing matters as desired, and on terms dictated, by Jakks, the payor of bribes to both men.  Shenker's and Bell's pleas <u>both</u> admit to the kickback arrangements on the videogame license, and WWE estimates the damages associated with the criminal conduct on the videogame license alone to exceed $100 million.

K&L|GATES

Honorable Stefan R. Underhill
April 26, 2007
Page 3

## I.   <u>The Underlying Criminal Scheme</u>

Shenker and Bell both occupied positions of trust. Both men were responsible for securing intellectual property licenses for WWE. In general, these licenses permitted third parties to use the name, persona and likeness of talent under contract to the WWE on various products sold to the public. In return, such licensees would pay a royalty, calculated typically as a percentage of the net sales price, to WWE. In turn, this royalty income would be shared with WWE talent by percentages set forth in their contracts with WWE. The crimes against trust not only injured WWE but also the talent whose peak earning power typically exists only for a few years.

It was the responsibility of both men to secure the best licenses in various product categories at the best rates available in the market. Bell was to develop licensing deals from opportunities in house, either by renewing existing licenses pre-dating Shenker or because he would deal with potential licensees who called WWE directly seeking such a license. Bell was not to be paid any commission on such licenses, as he was a salaried employee. Shenker, on the other hand, was to utilize his supposed expertise to develop other licensing opportunities for WWE which, if accepted by WWE, would result in Shenker getting a specified percentage of the income derived by WWE from licenses procured and negotiated by him.

Given their positions of trust, WWE relied on both men's licensing recommendations. As the pleas establish, their positions of trust were abused for personal gain at the expense of WWE and its talent. All of what is now known about their actions was learned in discovery in a civil suit ironically brought against WWE in October 2000 by Shenker as part of his criminal scheme. Everything now known was learned only because WWE persevered through serial perjury, destruction of evidence, and outright fabrication of evidence. But for the strong and decisive actions of the Honorable Chase Rogers, now nominated to be the Chief Justice of the Connecticut Supreme Court, Shenker would have been able to secure a criminally fraudulent judgment against WWE built on perjury and outright fabricated evidence. Time and again, Judge Rogers acted to permit the discovery of the true facts despite massive obstruction of justice orchestrated by Shenker. Judge Rogers issued fifteen compulsion orders related to Shenker's obstruction of the discovery process. Shenker himself had to be deposed six different times for a total of eleven days. Once, he refused a direct order to appear for a deposition on an agreed date and was ordered to pay $4,718.70 for costs and counsel fees from which he filed a frivolous appeal so as not to comply with the order. Fifty two depositions were taken, not one of which would have been necessary had Shenker told the truth from the onset.

K&L|GATES

Honorable Stefan R. Underhill
April 26, 2007
Page 4


Judge Rogers' Opinion addresses at length the extensive criminal misconduct employed by Shenker for over two years of extensive discovery, including the production of more than 92,000 documents, taking of 25 depositions as of the time his misconduct was brought to the Court's attention, the filing of 150 motions and the like. Id. at 966. Judge Rogers' Opinion notes, in several instances, that WWE had to obtain multiple compulsion orders to break through the unrelenting obstruction. Id. at 968. Judge Rogers, in the context of undisputed volumes of evidence of Shenker's two years of fraudulent litigation, specifically found that the WWE had "incurred significant legal fees and costs in the present case, and counsel for [WWE] has put in many hours of work, all of which directly resulted from Shenker's misconduct." Id. at 976-77.

As a result, Judge Rogers issued a scathing sanctions opinion soundly and emphatically denouncing Shenker's conduct, calling him, among other things, a "serial perjurer." Id. at 966.

The full extent of Shenker's criminal conduct can never be known due to his destruction of critical evidence, also noted in Judge Rogers' Opinion, regarding the criminal scheme and his insistent refusal to cooperate. Painstaking, time-consuming and expensive discovery from third parties who did not join into Shenker's obstruction of justice, such as banks and accountants, provided key information. Thus, it is now known that Shenker secretly set up a bank account at the Hang Seng bank in Hong Kong in the name of a foreign corporation he owned called Stanfull Industrial, Inc. ("Stanfull"). As noted by Judge Rogers, Shenker perjured himself to conceal this bank account for years. Id. at 970. Through the years, he used that account as a vehicle for numerous crimes, including the ones he was charged with, and numerous crimes he was not charged with, such as receiving bribes and kickbacks from licensees and potential licensees, tax fraud, travel act violations and money laundering.[2] He also used that account to conceal payments to Bell for his participation in the criminal scheme, at times by obtaining bank drafts from the Hang Seng bank payable to Bell and designed to be untraceable back to Shenker. The earliest use of that account as a conduit to receive bribes was in early 1998, when a publicly traded company, Jakks Pacific, Inc. ("Jakks"), began depositing monies into Shenker's account at Stanfull. Jakks, at the time, was an existing licensee of WWE and held a domestic toy license. Jakks desired expanded toy rights but was also aggressively pursuing one of the most lucrative licenses in America—for WWE videogames. These bribes, made on the order of the highest ranking executives of Jakks, were affirmatively concealed by all involved, both at the time the bribes were paid and in the ensuing litigation brought by Shenker. After Jakks caused the monies to

---

[2]     Shenker's plea to the conspiracy count establishes his money laundering activities.

K&L|GATES

Honorable Stefan R. Underhill
April 26, 2007
Page 5

be deposited into Shenker's Hong Kong bank account, Shenker would go to the Hong Kong
bank and obtain bank checks splitting the money with Bell for his participation in the
scheme. Again, Judge Rogers made specific findings that it was "apparent" why Shenker
lied to conceal his ownership of Stanfull—he used it to launder money to Bell and to receive
substantial monies from licensees, Jakks included. Id. at 970.

After receiving these payments, both Shenker and Bell disregarded their fiduciary
duties in order to steer the videogame license in the manner desired by Jakks. Neither
Shenker nor Bell sought out proposals from other reputable videogame companies and
affirmatively tried to discourage other bidders from even bidding for the license. Still later,
when other companies attempted to bid on the license, Shenker called Jakks and provided the
terms of competing offers to Jakks. Jakks then called one of the prospective bidders, THQ,
Inc. ("THQ"), and advised THQ that it was in control of the license and urged THQ not to
independently bid, but instead to join with Jakks and make a sub-market bid, which they did.
Both Bell and Shenker then recommended that sub-market license to WWE for a term of ten
years with a right to renew it vested in Jakks/THQ for another five years. As further
inducement to Bell to go along with the criminal scheme, Shenker promised to split the
millions Shenker would be paid on that license with Bell, and he did so.

In terms of assessing the relative culpability of Shenker and Bell, we believe it must
be pointed out that there is no evidence that Bell ever acted corruptly prior to the receipt of
the aforementioned Jakks money delivered by Shenker. After Shenker corrupted Bell with
the bribes from Jakks, the criminal conduct escalated.

Shortly after taking the aforementioned bribes from Jakks, Shenker solicited
kickbacks from the t-shirt licensee of the WWE—Trinity Products. Trinity desired to have
an exclusive right to be the only t-shirt licensee authorized to sell to Wal-Mart. In return for
a secret kickback of 2% of sales to Wal-Mart to be paid to Shenker, Shenker agreed to the
secret exclusive grant of rights and promised Bell he would split those kickbacks. Shenker
subsequently got three payments for Trinity but only split one with Bell, further evidencing
Shenker's primacy in the scheme.

Additionally, Trinity had been an existing licensee of WWE prior to Shenker being
retained, and as such he was not entitled to be paid any commissions. In fact, Shenker's
contract with WWE specified that he was not entitled to be paid commissions on the Trinity
license. As a further part of the scheme, Bell internally assigned that license to Shenker to
"administer" and directed that Shenker be paid his contractual commission rate, which of
course they both split. That aspect of the scheme, which involved hundreds of thousands of
dollars stolen from WWE, was arrogantly referred to by Shenker under oath as a "win-win"

K&L|GATES

Honorable Stefan R. Underhill
April 26, 2007
Page 6

for both he and Bell.  As with other aspects of his crimes, Shenker engaged in criminal conduct to conceal the Trinity aspect, all of which Judge Rogers so found.  Id. at 969-70.

As a further aspect of the scheme, Shenker and Bell agreed that in-house opportunities would be referred to Shenker in exchange for a split of the ensuing commission stream WWE paid to Shenker.  At the height of the scheme, Bell routinely invoiced Shenker for the promised kickbacks on licenses involved, an action which eventually exposed the crimes despite Shenker's subsequent destruction of almost all of those invoices.

The criminal conduct of both men continued throughout their remaining tenure at WWE.  Shenker, however, had more crimes in mind.

## II.    Shenker's Fraudulent Lawsuit

On June 13, 2000, WWE terminated Shenker's contract with WWE.  The initial termination of Shenker's agency contract with WWE was done pursuant to a contract provision permitting WWE to do so if it changed business direction.  Under that provision of the contract, WWE remained liable to pay Shenker commission on licenses which he procured and negotiated.  Another provision of his contract, however, affirmatively disentitled Shenker from any further commissions if he engaged in fraudulent or criminal acts, which he in fact knew he had done repeatedly but had concealed from WWE.

Following his termination, and with full knowledge that he had engaged in fraudulent and criminal acts, Shenker demanded that WWE pay him millions of dollars to buy out his putative right to future commissions.  By far, the largest component of his financial demands related to the fifteen-year videogame license tainted by bribes and other illegal conduct. When the parties could not agree on settlement terms, Shenker commenced a legal action against WWE with the clear intention of obtaining a fraudulent judgment against WWE entirely dependent upon his ability to conceal the truth from WWE.  In order to do so, he repeatedly perjured himself, destroyed evidence, and literally fabricated documentary evidence, both to create a pretextual explanation for the payments he had made to Bell and to conceal the monies he had been paid by Jakks and split with Bell.  Consistently, Shenker lied about whether he had ever accepted monies from licensees, owned any other corporation, or had paid Bell any money.  After Shenker falsely denied that he had paid Bell any money, we learned from third party discovery that he had done so.  Rather than admitting the truth, he instead destroyed the original documentation (the invoices from Bell for the kickbacks) and literally fabricated numerous phony invoices designed to make it appear that the payments were for matters unrelated to WWE, such as for work on a kitchen disposal project.  Shenker initialed these documents and backdated them as part of the ruse.  These fabricated

K&L|GATES

Honorable Stefan R. Underhill
April 26, 2007
Page 7

documents were turned over to WWE in discovery, and Shenker then perjured himself by testifying that the phony invoices were the real reason he paid Bell. Id. at 968-69.

In order to conceal the receipt of bribes from Jakks and the use of Stanfull as a money laundering device, Shenker falsely denied under oath owning any other corporations. When third party discovery revealed both the existence of Stanfull and that Stanfull had paid Bell money, Shenker lied about its purpose and defied court orders to produce the records of Stanfull. When evidence surfaced that he had lied about whether licensees had paid him money, he continued to deny that Jakks paid him any money. When evidence of one payment from Jakks emerged, he lied and said that was the only payment from Jakks. He consistently lied about the number of payments from Jakks, the total amount of payments from Jakks, when the payments were made, and the reason for the payments. He concocted a phony reason for the payments from Jakks at odds with an actual invoice he had sent Jakks containing an entirely different description for the payments than his sworn testimony—one which he destroyed and never produced but which was later obtained via third party discovery.[3]

Unfortunately, at the same time Shenker was lying about Jakks and the payments made to him, so too was Jakks. In largely mirror-image fashion, Jakks denied making any payments to Shenker despite the fact that the payments were authorized by the highest ranking executives of Jakks. After WWE obtained independent proof that Jakks had paid Shenker money, Jakks offered a completely different explanation for the payments than Shenker had given, and both versions were lies. The Jakks officials who authorized the payments feigned lack of knowledge about the payments and refused to identify who had authorized the payments. Once again, only decisive action by Judge Rogers permitted the truth to emerge. After Judge Rogers issued a compulsion order, Jakks admitted that the payments had been authorized by the same high ranking executives who had feigned lack of knowledge under oath. As noted, specific factual findings by Judge Rogers establish that a

---

[3]      In his Sentencing Memorandum, Shenker falsely states that he corrected his perjury in an alleged March 2003 "recantation" and "confessed" in a subsequent deposition. Nothing could be further from the truth. His "recantation" continued the lies about Jakks and simply offered another false and pretextual reason for the payments to Bell. For example, Judge Rogers' Opinion specifically notes that Shenker continued to provide false information after being exposed as a perjurer in December 2002, specifically on February 18, 2003, when he amended interrogatory responses which falsely blamed Bell for making the kickback arrangements with Trinity. It took yet another deposition on April 2, 2003 to expose that lie. Id. at 972.

K&L|GATES

Honorable Stefan R. Underhill
April 26, 2007
Page 8

central reason for the perjury of Shenker about the existence of Stanfull was to cover up the payments from Jakks. Id. at 970.

As a result of Shenker's litigation crimes, WWE had to use international process and have its counsel fly to Hong Kong twice to get Shenker's records from the Hang Seng bank—all at great cost to WWE—in order to learn the truth about monies into and out of that account, including the Jakks payments. In sum, the extent, depth, and unrelenting obstruction of justice orchestrated by Shenker in his fraudulent lawsuit against WWE simply cannot be overstated.

## III.   The Events of December 2002

In December 2002, both Shenker and Bell were deposed. Both men perjured themselves extensively by denying that any bribes and/or kickbacks had occurred and by vouching for the authenticity of the phony invoices Shenker had fabricated in a pretextual attempt to explain the payments to Bell. For the entirety of two days, Shenker on videotape committed rank perjury on virtually every subject, as became obvious at the end of his deposition when he was confronted with one of the true invoices Bell had sent for the kickbacks due him. That true invoice had escaped the shredder and had been inadvertently produced. Immediately following his deposition, Shenker was sent by his civil counsel to retain criminal counsel. For his part, Bell also retained criminal counsel and thereafter asserted his Fifth Amendment rights. Unfortunately, Shenker was not yet done with his perjurious behavior or attempts to obtain a fraudulent judgment.

## IV.   Shenker's Perjurious "Recantation"

Following his round of serial perjury in December 2002, Shenker spent the next three months with his civil counsel devising 24 pages of supposed "corrections" to his perjured testimony and devising a new round of false answers to interrogatories designed to continue the deception. As previously noted, even after being caught perjuring himself, Shenker filed false interrogatory amendments in February 2003 before he filed his false recantations in March 2003. The testimonial "corrections" were in the form of highly scripted yet equally false changes to his deposition testimony. In his purported recantations, which were nothing more than replacing one perjurious theme with another, Shenker concocted the theme that it was Bell's fault—the same theme adopted in the interrogatory answers filed in February 2003 adjudicated by Judge Rogers to have been false. Id. at 972. In his "Bell made me do it" thesis, Shenker tried to conjure up notions of business necessity and duress as the reason he paid bribes and kickbacks to Bell. While purporting to be coming clean, Shenker's scripted recantations again continued the lies about the payments from Jakks. Following this

K&L | GATES

Honorable Stefan R. Underhill
April 26, 2007
Page 9

charade, and on order of the trial court, Shenker was redeposed about the changes in his testimony and was exposed as still lying. Far from "confessing" during that deposition, Shenker was still lying in the hopes of maintaining his suit against WWE and was still using lies to do so. At no time did he ever offer to drop his lawsuit against WWE, and he did all he could do to continue it, as he does to this date.

Instead, driven by the desire to continue his fraudulent lawsuit based on his "recantation", Shenker arrogantly admitted to deliberately lying in his prior testimony. He was also shown to be lying regarding his new found "Bell made me do it" thesis. We understand Shenker may attempt to resurrect this pretext again at sentencing. Since Shenker evidently may try the same gambit with this Court at sentencing to avoid the sentence he deserves, WWE points to some of the many facts which demonstrate Shenker's thesis that Bell made him do it is a lie.

1.    Shenker, not Bell, was the person who negotiated the bribes from Jakks and had those monies deposited into his foreign bank account. Shenker then split that money with Bell. <u>These are the first payments made to Bell in the scheme, and Shenker is the one who made them</u>. Shenker also took kickbacks from other licensees paid into his foreign account but did <u>not</u> split those with Bell. There is no evidence that Bell ever took a bribe or kickback before accepting the Jakks money delivered to him by Shenker.

2.    Bell was terminated by WWE on March 24, 2000 and as such was no longer in any position to "shake down" Shenker. Logically, if Shenker was paying Bell because Bell was in a position of authority, those payments would stop after Bell was terminated since Bell no longer had any influence over licensing matters. Yet, it is a matter of record that Shenker paid Bell hundreds of thousands of dollars on their kickback scheme from commissions paid Shenker <u>after</u> Bell was terminated.

3.    After both men were no longer with WWE, Shenker rented office space to Bell for years and did business with him—not the actions of somebody who was shaken down previously.

4.    Proving there is no honor among thieves, Shenker received three payments from Trinity for the 2% kickback deal with Trinity, yet he only split one of those payments with Bell. And, as found by Judge Rogers, Shenker lied when he tried to blame this on Bell in his false February 2003 interrogatory responses. <u>Id.</u> at 3.

K&L|GATES

Honorable Stefan R. Underhill
April 26, 2007
Page 10

> 5.    The arrangement whereby the existing Trinity t-shirt license was assigned to
>        Shenker to create a revenue stream of commissions is not and cannot be Bell
>        shaking down Shenker.  It is Shenker getting a commission for a license he
>        had nothing to do with and then splitting those monies with Bell.  Before they
>        did so, WWE did not have to pay any commissions to anybody.  By doing so,
>        as Shenker admitted under oath, it was a "win-win" for both men.
>
> 6.    Lastly, with the notable exception of the videogame license and amendments
>        to Jakks' toy license, Shenker's payments to Bell were not for favorable
>        treatment on licenses which Shenker desired to have WWE grant.  Instead,
>        Shenker's payments to Bell were for licenses which Bell should have done in-
>        house but instead referred to Shenker in order to create a commission revenue
>        stream both could then split.  Indeed, both men plead guilty to doing exactly
>        that.

In any event, the evidence of Shenker's litigation misconduct was submitted to Judge
Rogers in the form of a motion for sanctions.  Judge Rogers entered a default against Shenker
on all of his claims against WWE, a default against Shenker on WWE's counterclaim as to
liability, and ordered that Shenker pay WWE's counsel fees.  Id. at 977-78.  In the same time
frame, Judge Rogers agreed that the conduct of Shenker and Bell should be referred to
criminal authorities for investigation and prosecution, which was then done and which
culminated in the pleas of both Bell and Shenker.

Unfortunately, even in the face of such strong judicial action, Shenker continued his
bad faith towards WWE in the next phase of his fraudulent lawsuit.

## V.    __The Prejudgment Restraint Frauds__

Under Connecticut law, a litigant has the right to attach assets of a potential judgment
debtor in advance of trial provided certain requirements of proof are satisfied.  Given the
admitted acts of deceit by Shenker, and his litigation misconduct, WWE moved for a
prejudgment restraint ("PJR") on October 2, 2003.  Once again, Shenker defrauded WWE.
On the eve of the hearing on the motion, and to avoid it, Shenker indicated he would agree to
a PJR on up to five million dollars of assets and represented he would immediately turn over
artwork having a value of one million dollars.  Shenker further promised to make up any
difference in the value of the artwork if it was not worth a million dollars.

**K&L|GATES**

Honorable Stefan R. Underhill
April 26, 2007
Page 11


True to form, the artwork was nowhere near a million dollars and was subsequently appraised as having a fair market value of $303,750 and a liquidation value of $151,875. Instead of making up the difference as he had promised to do, Shenker refused to provide any further monies. Instead, Shenker opened up a bank account in New York so that WWE could not attach the deposits via Connecticut process and also caused a commission stream paid him monthly from foreign sources to be paid to his wife instead, again to frustrate WWE's ability to attach it as security for the anticipated judgment.

At no time did Shenker ever make any offer to settle the litigation and instead kept actively litigating everything in state court even in the face of the default, causing WWE further and additional expenses. Indeed, in the week before he entered his plea, his counsel represented to the state court that they were going to win the then impending criminal trial and needed to pay $50,000 to criminal counsel to do so, claiming WWE was interfering with Shenker's right to counsel by opposing that request. A few days later, he entered his plea of guilty.

## VI.   Bell's Conduct After the Scheme was Exposed

Bell's conduct after the perjury scheme became manifest in the December 2002 depositions markedly differs from Shenker's. Originally, Bell was represented by James Pickerstein, who had to recuse himself due to a conflict, and then by John Williams. Both Mr. Pickerstein and Mr. Williams have been extremely courteous, professional and of assistance to Bell, the Court and to WWE.

In March 2004, the WWE moved for summary judgment on state claims it had brought against Bell. WWE documented damages on the state claims of $10,568,206.80 in its motion for summary judgment. See Exhibit A. On August 17, 2004, Judge Rogers granted partial summary judgment to WWE as to Bell's liability for breach of contract, statutory conversion, breach of fiduciary duty, fraudulent misrepresentation and civil conspiracy. See World Wrestling Entm't, Inc. v. Bell, No. X05CV030193994S, 2004 WL 2039700 (Conn. Super. Ct. Aug. 17, 2004). Shortly thereafter, WWE initiated a federal lawsuit against Jakks, THQ, Jakks/THQ and Shenker and Bell centering on the criminal activity surrounding the toy license and videogame license.

On February 10, 2005, Bell accepted responsibility for his criminal conduct by a plea arrangement which obligated him to cooperate with the Government and make restitution to WWE in the amount of $1,946,634.00, which the plea agreement also stipulated was the relevant guideline loss. Bell, through counsel, thereafter engaged in discussions with WWE's counsel aimed at settling the then pending state case against him and cooperating

# K&L|GATES

Honorable Stefan R. Underhill
April 26, 2007
Page 12

with WWE in ascertaining the truth about the events in question. The WWE and Bell negotiated a resolution of the then pending state law claims against him. Under the terms of that settlement, Bell promised to pay, and did pay, two and a half million dollars ($2,500,000.00) to WWE and agreed to provide truthful cooperation to WWE regarding all matters in question, including about the improprieties involved in the videogame license which was then and still is the subject of pendent litigation. Significantly, Bell acknowledged that truthful cooperation may well lead to additional liability being imposed upon him in the federal action, and he received no release for those claims. By his actions, Bell effectively disgorged all monies he personally received for his participation in the scheme (approximately one million dollars) and paid additional monies to settle the state law claims consistent with his ability to pay. Although WWE regards his payment as settling the approximately $10 million in state claims then pending against him in Connecticut state court, it should in fairness be noted that the amount he paid exceeds the amount he was ordered to pay as restitution as part of his plea.

At the time he took these remedial actions, Bell was the licensing agent for Orange County Choppers, a valuable licensing commodity from which Bell derived substantial income. A predictable consequence of his admission of guilt was that he would lose that account, which he subsequently did, but that did not stop him from accepting responsibility before this Court and towards WWE. In sum, Bell has conducted himself dramatically different than has Shenker following exposure of the underlying scheme—a factor which we respectfully submit the Court should consider in sentencing Bell. He has shown genuine remorse, accepted responsibility, and promised to do what he can to have the full truth exposed so that others may be brought to justice.

## VII.   Shenker's Conduct Post-Plea

Unlike Bell, Shenker refused to accept responsibility of any kind for his actions. He refused to entertain a plea prior to indictment, requiring the Government to prepare an indictment, a superseding indictment, and for trial. After indictment, he continued his civil suit against WWE, made no offer to resolve it, and continued his litigation misconduct. To prevent WWE from recovering his ill-gotten gains, he transferred income streams to his wife, opened bank accounts in New York, and placed the fruits of his crime in accounts he alleges are immune from execution.

As noted, the week before he entered his plea, Shenker appeared before the Honorable Michael Shay, together with his civil and criminal counsel. The criminal charges were belittled, with counsel advising the court Shenker intended to "win" his criminal trial if only the court authorized a $50,000 expenditure in excess of the PJR restraints to pay

# K&L | GATES

Honorable Stefan R. Underhill
April 26, 2007
Page 13

criminal counsel. After obtaining permission and a modification of the PJR to make such a payment, Shenker plead guilty exactly nine days later.[4] Shenker held out until the last possible moment and ended up taking a plea to avoid conviction on all counts in a case where he never had any real defense.

Shortly after his plea, WWE contacted both his civil counsel and his criminal counsel to determine if Shenker intended to make an offer of restitution to WWE and to cooperate with WWE. WWE received no response until receiving the letter dated March 26, 2007 attached to Shenker's Sentencing Memorandum. Efforts to discuss the letter with Shenker's counsel were unsuccessful. In the view of WWE, Shenker has no remorse whatsoever regarding any of the criminal activity he directed at WWE and is sorry only that he got caught. His actions are vindictive and designed to punish WWE for exposing him as a thief and corrupt man. He has not cooperated with WWE in order to obtain relief from the criminal activity surrounding the videogame license and has at every turn joined ranks with those who bribed him to delay, obfuscate and prevent the truth from coming out. WWE respectfully submits he is incapable of ever changing or reforming and that his conduct deserves to be punished by a term of lengthy imprisonment that is substantial and a restitution order which reflects the damages he not only caused but refuses to ameliorate.

## VIII. <u>Restitution</u>

In setting forth its views on restitution, WWE reiterates the point made previously regarding the damages caused to WWE by the criminal conduct surrounding the videogame license. Specifically, those damages far exceed the ability of either Shenker or Bell to pay and at this time cannot be established exactly in any event. The precise amount of damages can be proven only after discovery from those holding the videogame license obtained by the criminal conduct. WWE has commenced litigation against those involved and will look to those proceedings to recover the damages from those with the ability to pay the damages.

Thus, WWE's position is that the focal point of a restitution order relates to Shenker, who has not paid any money and who benefited from the scheme financially far more than did Bell. In his plea agreement, Shenker acknowledged that 18 U.S.C. § 3663A was applicable to the restitution he should be ordered to pay WWE—the acknowledged victim here. Indeed, Section 3663A, also known as the Mandatory Victims Restitution Act ("MVRA"), became effective April 24, 1996 and makes restitution mandatory after that date.

---

[4]       WWE strongly suspects that another party has paid portions of Shenker's counsel fees in the criminal case before this Court.

**K&L|GATES**

Honorable Stefan R. Underhill
April 26, 2007
Page 14


See United States v. Boyd, 239 F.3d 471 (2d Cir. 2001).  Mail fraud clearly falls under the
MVRA, as it is an offense against property and involves fraud or deceit.  See Boyd, 239 F.3d
at 471-72 (applying § 3663A to a defendant found guilty of conspiracy to commit mail and
wire fraud); United States v. Gabriel, 125 F.3d 89, 106 (2d Cir. 1997); United States v. Grice,
319 F.3d 1174, 1177 (9th Cir. 2003) ("The Mandatory Victims Restitution Act . . . applies to
both mail fraud and forgery"); United States v. Bach, 172 F.3d 520, 523 (7th Cir. 1999).

The underlying purpose of 18 U.S.C. § 3663A is similar to the purpose behind tort
restitution:  to compensate victims for loss suffered as a result of the defendant's conduct.  In
Hughey v. United States, the United States Supreme Court held that restitution under 18
U.S.C. § 3663A is to restore victims to the state they were in before the defendant's conduct
caused loss or damage.  495 U.S. 411, 413, 416 (1990).  Though 18 U.S.C. § 3663A is a
criminal statute, its fundamental nature and purpose is civil.  See Boyd, 239 F.3d at 472
(citing United States v. Wells, 177 F.3d 603, 610 (7th Cir. 1999) for the proposition that
"retroactive application of the MVRA does not violate the ex post facto clause because
restitution is not criminal punishment"); United States v. Ferranti, 928 F. Supp. 206, 217
(E.D.N.Y. 1996) ("When applicable, pecuniary penalties serve more than punishment
purposes; they provide tort-like remedies to institutions, communities, and victims who
suffer the consequences of criminal conduct.").

In United States v. Bach, Chief Judge Posner for the Seventh Circuit described the
tort-like nature of the restitution statutes in the criminal code, applying the analysis to a case
involving mail fraud:

> Crimes and torts frequently overlap.  In particular, most crimes that
> cause definite losses to ascertainable victims are also torts:  the
> crime of theft is the tort of conversion; the crime of assault is the
> tort of battery – and the crime of fraud is the tort of fraud.
> Functionally, the Mandatory Victims Restitution Act is a tort
> statute, though one that casts back to a much earlier era of Anglo-
> American law, when criminal and tort proceedings were not clearly
> distinguished . . . The Act enables the tort victim to recover his
> damages in a summary proceeding ancillary to a criminal
> prosecution . . . It is a detail from a defrauder's standpoint whether
> he is ordered to make good his victims' losses in a tort suit or in
> the sentencing phase of a criminal prosecution.

172 F.3d 520, 523 (7th Cir. 1999) (internal citations omitted).

# K&L|GATES

Honorable Stefan R. Underhill
April 26, 2007
Page 15

With these concepts in mind, WWE respectfully submits that Shenker should be ordered to pay restitution to the WWE for the following matters, all of which are consistent with the foregoing legal principles.

## A.    Commissions Paid After March 19, 1998

The Agency Agreement between Shenker and WWE clearly provided that:

> "This Agreement may be terminated by [WWE] prior to its expiration of December 31, 1998 as follows:
>
> (iv) if Agent engaged in any act of fraud, theft, deceit, unethical conduct.  In this event, [WWE] may terminate this Agreement immediately upon written notice to [Shenker], and from that date forward, [Shenker] shall not be entitled to any further commissions under this Agreement.

Shenker admitted under oath on April 2, 2003 to making the secret kickback agreement with Trinity on March 19, 1998.  Based on Shenker's admission in the civil case, which was confirmed by his plea, there is no question that Shenker engaged in an act of fraud, deceit, and unethical conduct on March 19, 1998.  Shenker's admission establishes that, pursuant to his contract, he was not entitled to be paid any further commissions after that date.  His criminal concealment made it possible for him to still collect such monies.  Thus, WWE has suffered damages in the amount of $5,970,317.17, the amount of commissions paid to SSAI after March 19, 1998, the date of an admitted act of defalcation.

## B.    The Commission Splitting Scheme

Should the court not award the $5.9 million component for any reason, WWE respectfully submits that Shenker should be ordered to pay at least half of the $1.9 million he admits to receiving pursuant to the kickback arrangements with Bell.  In Shenker's plea agreement, the Government and Shenker agreed "that the relevant guideline loss is between $1.0 million and $2.5 million," based on a stipulation of offense conduct that Shenker "paid Bell approximately $950,000 in secret payments from 1998 to 2002 which was approximately half of the money (approximately $1.9 million) that Shenker received from WWE for certain commission payments."  The $1.9 million figure derived by the Government is actually comprised of two components:  (i) select commissions Shenker received from WWE and split with Bell pursuant to their commission splitting scheme, totaling $1,673,980, which is included in the $5,970,317.17 figure above; and (ii) proceeds

K&L|GATES

Honorable Stefan R. Underhill
April 26, 2007
Page 16

from the sale of certain stock Shenker received in the form of commissions, which he subsequently split with Bell, totaling $243,772, which will be explained more fully below.

Thus, on Shenker's own plea, he admits to having received net of nearly one million dollars personally on this aspect of the scheme. In his unilateral offer of restitution, Shenker effectively concedes that his obligation to make restitution includes at least these monies but makes no offer with respect to his other ill-gotten gains documented herein. Moreover, Shenker does not even offer the restitution amount in liquid assets he has readily available. The cash component of his offer is slightly less than $775,000, with the rest being WWE's obligation to raise by shouldering the expense of selling the junk art Shenker previously, and falsely, represented was worth a million dollars. Shenker makes no provision to make up any deficiency in any such sale. If not ordered to repay this amount in cash, he will effectively be permitted to retain some of the fruits of the crime he has admitted to committing and be rewarded for his obdurate behavior.

C.    **Legal Fees Associated with Fraudulent Lawsuit**

Shenker's restitution offer does not include one penny for the costs of his fraudulent lawsuit. Yet, Shenker's criminal litigation misconduct was a central part of the conspiracy count for which Shenker has admitted guilt. See Superseding Indictment ¶ 12(b)(d), 18, 20(d), 21-26. Moreover, Shenker's Stipulation of Offense Conduct further acknowledges certain of the fraudulent actions he took in his lawsuit against WWE, including the fabrication of phony invoices purporting to reflect why he had paid Bell money. In his Sentencing Memorandum, Shenker asserts that he came clean in March 2003. Although that is not correct for reasons previously stated, it is significant to note that Shenker does not offer any monies for the two years preceding this March 2003 "recantation" during which WWE had to incur legal fees and costs directly attributable to the fraudulent litigation activity, both as found by Judge Rogers and as established by his plea. As of March 2, 2003 when Shenker allegedly recanted, WWE had incurred legal fees and costs of $1,913,937.38.

Even after the date of his "recantation", WWE had to incur substantial costs preparing the extensive sanctions motion to submit to Judge Rogers and to continue the search for the truth. The normal expense of litigation was consistently multiplied due to Shenker's tactics, as he had to be repeatedly deposed and WWE constantly had to conduct third party discovery to unravel his perjury and prove it. As noted in WWE's letter of February 8, 2007, the legal fees of WWE of $4,387,616.80 are a direct result of Shenker's fraudulent litigation. In similar situations, where legal fees are a direct result of the defendant's criminal scheme in bringing criminally fraudulent litigation, courts consistently include counsel fees as part of

K&L|GATES

Honorable Stefan R. Underhill
April 26, 2007
Page 17

the restitution order.  United States of America v. Gibson, 92 F.Supp.2d 562 (S.D.W.Va. 2000); United States v. DeGeorge, 380 F.3d 1203 (9th Cir. 2004).

Under the circumstances, WWE believes the order of restitution should include amounts for this element of damages and certainly for the amount incurred prior to his "recantation."

**D.**    **$243,772 – Proceeds from Sale of THQ, Inc. and Jakks Pacific, Inc. Stock**

As part of a bribe to induce Bell to recommend to WWE that it grant its lucrative videogame license to THQ/Jakks Pacific, LLC ("THQ/Jakks"), Shenker promised to split not only commissions on the videogame license but also to pay Bell 50% of the profits on the sale of THQ and Jakks stock that Shenker obtained as part of its commission on the deal.[5]

Under this branch of the commission splitting scheme, Shenker received at least $243,772 of which $121,886 was paid to Bell.[6]  Thus, WWE suffered damages in the amount of $243,772 which should be included in Shenker's restitution amount.

**E.**    **$60,883 – Kickbacks Shenker Received from Trinity Products, Inc.**

As explained above, on March 19, 1998, Shenker and Bell met with the President of Trinity Products, Inc., one of WWE's t-shirt licensees, and entered into a secret kickback scheme related to Trinity's sales of WWE-licensed products to Wal-Mart.  Pursuant to the kickback scheme, Trinity paid Shenker three payments totaling $60,883 in exchange for an exclusive right which only WWE could grant and for which WWE was to be paid.  Only one of the three payments was split with Bell.  The payment Shenker split with Bell was a Trinity check for $28,881.68.  Thus, Shenker personally pocketed $46,393.00 of the Trinity kickback.  Shenker's restitution offer includes no monies for this aspect of his scheme.

---

[5]      Shenker received warrants and stock options from THQ and Jakks as part of its commission because the THQ/Jakks license proposal offered warrants and stock options to WWE as part of the deal.  Since the warrants and options were part of the consideration paid to WWE in connection with the granting of the license to THQ/Jakks, Shenker claimed a right to 11% of such warrants and options.

[6]      As noted above, the $243,772 is included as part of the $1.9 million figure referenced in the Stipulation of Offense Conduct contained in Shenker's plea agreement.

K&L | GATES

Honorable Stefan R. Underhill
April 26, 2007
Page 18


## IX.    **CONCLUSION**

WWE appreciates the opportunity to provide its views on the sentencing and
restitution issues.  Although both Jim Bell and Stanley Shenker are guilty of criminal
conduct, as acknowledged by their respective pleas, WWE firmly believes on the basis of the
evidence that Stanley Shenker deserves, by far, the stiffest sentence available to the Court.
His conduct not only demonstrates a capacity to engage in widespread crimes, including not
only crimes against trust but also crimes against the judicial process.  His perverse belief
system will be reinforced, not punished, should he avoid a substantial term of imprisonment
and an appropriate restitution order.

Very truly yours,

Jerry S. McDevitt

JSM/emw

Enclosure