| | | |
|---|---|---|
| DOCKET NO. X05-CV-03-0193994-S | : | SUPERIOR COURT |
| | : | |
| WORLD WRESTLING ENTERTAINMENT, INC., | : | JUDICIAL DISTRICT OF STAMFORD/NORWALK |
| | : | |
| Plaintiff, | : | AT STAMFORD |
| | : | |
| vs. | : | COMPLEX LITIGATION DOCKET |
| | : | |
| JAMES K. BELL and BELL LICENSING, LLC, formerly known as BELL CONSULTING, LLC, | : | |
| | : | |
| Defendants. | : | MARCH 5, 2004 |

## PLAINTIFF, WORLD WRESTLING ENTERTAINMENT, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff, World Wrestling Entertainment, Inc. ("WWE"), by and through its attorneys and pursuant to Practice Book Sections 17-44, *et seq.*, hereby moves for summary judgment against Defendants, James K. Bell ("Bell") and Bell Licensing, LLC, f/k/a Bell Consulting, LLC ("Bell Consulting") (collectively the "Defendants"), as to Counts One, Two, Three, Four, Five, Six and Nine contained in WWE's complaint dated February 14, 2003. As is more fully set forth below, there is no genuine issue of material fact and, accordingly, WWE is entitled to a judgment as a matter of law.

## I.    Introduction

By this motion, WWE seeks summary disposition of its case against the Bell Defendants. Due to page limitations and in the interests of judicial economy, WWE has moved for summary judgment on only 7 of the 14 counts of the complaint against the Bell Defendants. WWE

selected the counts to move on based on the relative simplicity of these counts and because, if granted, those counts would provide WWE with the full measure of damages associated with the claims plead.

In reality, and in practical terms, the Bell Defendants no longer present any defense. The facts that support summary judgment are now well-established and documented by a mountain of uncontested documentary evidence. Despite massive obstruction of justice, a voluminous record reflecting the trail of bribes and kickbacks paid to Bell and Bell Consulting is now before the Court. For his part, Bell now invokes the Fifth Amendment in response to all discovery initiated when confronted with the mountain of evidence, all of which permits this Court to make adverse inferences against the Bell Defendants. All along the Bell Defendants knew they could only "defend" against WWE's claims if they could either conceal the payments made to Bell by SSAI or, if revealed, successfully perjure themselves as to the reason for the payments. Their efforts to do both failed, and the Bell Defendants now stand before this Court with the filthiest of hands and unable to raise a disputed issue of fact as to liability.

Insofar as damages are concerned, WWE submits that a few legal principles govern the calculation of damages. First of all, a wrongdoer such as Bell may not take advantage of the difficulty in computing damages created by his own wrongdoing. *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264 (1946); *Curiale v. Capolino,* 883 F.Supp. 941, 950 (S.D.N.Y. 1995). To be sure, the Bell Defendants' destruction of evidence in this case has no doubt operated to make it more difficult to prove the full measure of damages and, in some instances, has made it impossible to ascertain the full extent of damages, but there remains a large body of

cancelled checks and simple mathematical calculations enabling WWE to present evidence of damages which cannot be factually disputed. Secondly, and as will be demonstrated, the tortious activities associated with the SSAI/Bell Defendants' conspiracy were intentional torts, as was the conspiracy itself. Under the law of Connecticut, the Bell Defendants are therefore jointly and severally legally liable for the full measure of damages caused to WWE by the intentional torts conspiracy, and that amount is not limited to the amounts directly pocketed by the Bell Defendants. Instead, the damages also include all the ill-gotten gains of their co-conspirator, SSAI. Thirdly, the law cited herein makes it crystal clear that, with respect to both the bribes he received from SSAI and the salary he was paid by WWE while an unfaithful employee, the Bell Defendants must pay every dime of it back to WWE.

## II.     Standard of Review

Summary judgment "shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Practice Book § 17-49. Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact, a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. *Connell v. Connell*, 214 Conn. 242, 246 (1990); *Burns v. Hartford Hospital*, 192 Conn. 451, 455 (1984). To do so, the Bell Defendants may not simply rely on mere speculation or conjecture as to the true nature of the facts to overcome this motion. *Connell*, 214 Conn. at 246-47; *Strada v. Connecticut Newspapers, Inc.*, 193 Conn. 313, 317 (1994) To avoid summary

3

judgment, the party opposing summary judgment must respond with facts, not simply

conclusions and guesswork. *See Sivek v. Baljevic*, 46 Conn. Supp. 518, 521 (1999), *aff'd*, 60

Conn. App. 19 (2000).

## III.  Negative Inferences Against Bell and Bell Consulting

### This Court Should Draw Negative Inferences Against the Defendants As a Result of Bell's Refusal to Respond to Substantive Questions Based on Fifth Amendment Grounds.

Connecticut law is clear that that a negative inference may be drawn against a party in a

civil case when the party refuses to answer questions on Fifth Amendment grounds. *Olin

Corporation v. Castells*, 180 Conn. 49, 53 (1980) *citing Baxter v. Palmigiano*, 425 U.S. 308, 318

(1976). This Court should draw such negative inferences against the Defendants based on Bell's

invocation of the Fifth Amendment in response to virtually every question, the tact he has taken

following the disclosure of his and Shenker's prior perjury. Such adverse inferences are further

supported by the Defendants' refusal to answer interrogatories and document requests on Fifth

Amendment grounds, (Tab 1 and Tab 2)[1] and are corroborated by Shenker's admissions as to the

nature and extent of the Defendants' conduct.

## IV.  Factual Background

### Bell Hired by WWE

On or about March 2, 1995, Bell signed a Code of Conduct Agreement in order to be

hired by WWE. (Tab 3; Tab 4, p. 903; Tab 7, ¶ 3) Pursuant to the Code of Conduct Agreement,

---

[1]     WWE is submitting an Appendix containing the record evidence relied upon in this memorandum. The form of citation will be to that Appendix, *i.e.,* Tab ___, p. ___, etc.

Bell agreed that he would not "engage in any activities or have any personal or financial interests which impair, or appear to impair, [his] independence or judgment or otherwise conflict, or appear to conflict with [his] responsibilities to [WWE]." (Tab 4, p. 903; Tab 3; Tab 7, ¶ 4)

The Code of Conduct Agreement also expressly prohibited Bell from:  (a) accepting fees, commissions or property in connection with any transaction on behalf of WWE; (b) accepting or offering unauthorized or illegal payments; (c) using his position directly or indirectly for personal or financial gain; (d) personally taking advantage of business opportunities which might be of interest to WWE; and (e) serving as an officer, director, employee, consultant or promoter of for-profit organizations without WWE's prior approval. (Tab 4, pp. 71-73, 904-905; Tab 3; Tab 7, ¶ 5)

During his employment with WWE, Bell served in various capacities, including Director of Domestic Licensing (from March 20, 1995 until April 30, 1996); Vice-President of Pay-Per-View and Television Marketing (from May 1, 1996 until October 27, 1996); and Senior Vice-President of Licensing and Merchandise (from October 28, 1996 until March 24, 2000). (Tab 4, pp. 71-72, 905-906; Tab 7, ¶ 8) The bribery and kickback scheme took place while Bell was the Senior Vice-President of Licensing and Merchandising.

### Bell Introduces Shenker and SSAI to WWE

Shortly after he was hired, in or about April 1995, Bell introduced WWE to Stanley Shenker. (Tab 4, p. 907) Shenker is the sole owner and President of Stanley Shenker & Associates, Inc. ("SSAI"). (Tab 6, pp. 5-10) Bell and Shenker had maintained both a business and personal relationship for at least ten years prior to the introduction to WWE. (Tab 4, p. 908;

5

Tab 6, pp. 32-33)  On Bell's recommendation, WWE originally hired SSAI as a non-exclusive, outside licensing agent to assist Bell in the effort to expand WWE's licensing program.[2]  (Tab 7, ¶ 13)

**SSAI's Agency Agreement**

On or about April 2, 1997, WWE entered into the Agency Agreement with SSAI, which changed SSAI's role to an exclusive outside licensing agent.  (Tab 5, ¶ 6; Tab 8, p. 2)  The Agency Agreement provided that the agency services to be provided to WWE by SSAI would be primarily performed by Stanley Shenker ("Shenker").  (Tab 8, p. 2)  Paragraph 6(a) of the Agency Agreement, entitled "compensation to Agent," provided that "[I]n full consideration for the services to be rendered under [the Agency] Agreement," SSAI was entitled to receive a commission of eleven percent of royalties received by WWE on licensing deals or agreements "negotiated and procured specifically by [SSAI] pursuant to, and during the term of, [the Agency] Agreement."  (Tab 8, p. 3)  Paragraph 6(c) of the Agency Agreement expressly stated that SSAI was not entitled to receive commissions or royalties paid to WWE as a result of WWE's efforts or as a result of activities by parties that had been granted a license by WWE prior to the commencement of the Agency Agreement.  (Tab 8, p. 3)  The pre-existing licenses on which SSAI was not entitled to receive commissions were listed on Exhibit A to the Agreement and included Trinity, a t-shirt licensee, and Acclaim, a videogame licensee.  (Tab 8)

The Agency Agreement provided WWE with the right to terminate the Agency Agreement under certain circumstances, including:  (i) if WWE changed its strategic business

---

[2]     The arrangement between SSAI and WWE was not formalized in writing until August 20, 1996.

direction, and (ii) if SSAI committed any act of fraud, theft, deceit, or unethical conduct. (Tab 8,

p. 6) Section 13(a)(iv) of the Agreement specifically provided WWE with the right to terminate

the Agreement and discontinue payment of all commissions to SSAI:

> [I]f Agent engages in any act of fraud, theft, deceit, unethical
> conduct. In this event, Titan may terminate this Agreement
> immediately upon written notice to SSAI, and from that date
> forward, SSAI shall not be entitled to any further commissions
> under this Agreement.

(Tab 8, p. 6)

## Bell's Role at WWE

As Senior Vice-President of Licensing and Merchandise, Bell's responsibilities included

procuring licenses for WWE, negotiating license agreements between WWE and potential

licensees, WWE's performance pursuant to license agreements, and all other activities necessary

and/or attendant to the development and maintenance of WWE's licensing program. (Tab 4,

pp. 906-907; Tab 5, ¶ 3) Bell was expected to utilize the staff within the consumer products

department of WWE to field and screen potential licensees and to develop additional contacts for

future licensing opportunities. (Tab 7, ¶ 12) SSAI, on the other hand, was to bring to WWE an

even wider network of potential licensees allegedly due to his experience and expertise in the

area. (Tab 7, ¶ 15) Significantly, Bell was to review any such SSAI proposals and recommend

action on licensing proposals procured and negotiated by SSAI. (Tab 7, ¶ 16)

As a high-level management member, Bell was compensated solely by means of an annual salary.[3] (Tab 5, ¶ 16) Accordingly, Bell neither received, nor was he entitled to receive, additional compensation based upon sales of WWE-licensed products pursuant to license agreements obtained as a result of his efforts or SSAI's efforts. (Tab 5, ¶ 10)

Bell's position was a high-level management position on WWE's organizational chart. (Tab 4, p. 73; Tab 5, ¶ 5) Further, Bell understood his position to be an important one within the company. (Tab 4, p. 78) Additionally, Bell understood that WWE's CEO, Mrs. Linda McMahon, placed a heightened level of responsibility in Bell. (Tab 4, pp. 73-74; Tab 7, ¶ 9) Bell had superior knowledge, skill and expertise in the area of licensing and was under a duty to represent the interests of WWE. (Tab 7, ¶ 10)

### The Beginning of the Conspiracies

Due to the tremendous success of the WWE brand, starting in late 1997 early 1998, there was a great demand for license agreements with WWE, pursuant to which licensees could utilize WWE intellectual property in connection with sales of the licensees' own goods and/or services. (Tab 5, ¶ 12) Bell saw this increase in demand for WWE licenses as an opportunity to line his pockets with royalty revenue rightfully belonging to WWE. In order to implement his plan, Bell conspired with SSAI and Shenker in what became a massive kickback and bribery scheme, which was designed to, and did, defraud WWE out of millions of dollars in royalty revenue. During the conspiracy, the Bell Defendants and SSAI utilized foreign bank accounts, foreign corporations, demand drafts as payment vehicles, and Bell's secretly organized company to

---

[3]     Additionally Bell had the potential to receive discretionary performance bonuses from WWE, unrelated to licensing commissions. (Tab 5, ¶ 16)

8

conceal their scheme from WWE. The scheme was so brazen that the Bell Defendants actually invoiced SSAI and Shenker's other foreign company for the kickbacks.

### The THQ/Jakks Videogame License Conspiracy

At the time SSAI entered into the Agency Agreement with WWE, Acclaim was WWE's existing videogame licensee and desirous of having the license renewed. (Tab 5, ¶ 17) Because Acclaim was an existing licensee, renewal negotiations on its license did not involve SSAI but were conducted by Bell. (Tab 5, ¶ 18) If WWE had renewed the videogame license with Acclaim, SSAI would not have been entitled to any commissions on the license, one of the more lucrative licenses of WWE. (Tab 5, ¶ 19) SSAI had been working with a consortium involving THQ/Jakks, LLC[4] ("THQ/Jakks") to put together a competing proposal for the videogame license. (Tab 5, ¶ 20; Tab 6, pp. 1130-1138, 2467-2473, 2500-2520)

On January 14, 1998, during the active phase of the selection process for the videogame license, a foreign subsidiary of Jakks caused $40,000 to be deposited into the account of a company in Hong Kong, Stanfull Industrial, Ltd. ("Stanfull"), owned by Shenker. (Tab 9) The deposit was made into Stanfull's account at the Hang Seng Bank. That same day, Shenker split the money equally with Bell in the form of a demand draft for $20,000 he obtained from the Hang Seng Bank after depositing the Jakks money. (Tab 10; Tab 11; Tab 4, pp. 823-833) Significantly, this $20,000 payment is the very first payment made to Bell in their corrupt scheme. (Tab 6, pp. 2446-2448) After receiving the money, Bell told Acclaim not to even submit a proposal, which prompted Acclaim to complain to management of WWE and let it be

---

[4]     THQ/Jakks is a joint venture comprised of THQ, Inc. and Jakks Pacific, Inc. ("Jakks"). (Tab 5, ¶ 21)

known they still intended to make a proposal. (Tab 12) On April 7, 1998, Shenker made a second $20,000 payment to Bell. Again, the payment was made by Stanfull after another foreign subsidiary of Jakks deposited $40,000 into Stanfull's account at the Hang Seng Bank. (Tab 14) Two days later, Acclaim did submit an outline of a proposal on April 9, 1998. (Tab 13) On Bell's advice, WWE notified Acclaim a few days later that the license would not be renewed. (Tab 15) Bell now invokes his Fifth Amendment rights in response to questions whether Jakks bribed him in connection with the videogame license. (Tab 4, pp. 833-835) It is admitted by Shenker, however, that SSAI and Shenker also agreed to split all commissions on the deal equally with Bell if Bell advanced the THQ/Jakks deal over the Acclaim deal, and to also pay Bell 50% of the profits on the sale of THQ and Jakks stock that SSAI would receive if WWE accepted the THQ/Jakks proposal. (Tab 6, pp. 813-822, 1083-1084; Tab 4, pp. 852-867; Tab 16) There is no issue, therefore, whether Bell accepted bribes in connection with the videogame license. He did, and the only unresolved fact issue as to whether Jakks was complicit is not essential to this motion.

On May 7, 1998, Shenker submitted a deal sheet setting forth the proposed terms for a videogame license between THQ/Jakks and WWE, which Bell subsequently advanced. (Tab 5, ¶ 22; Tab 17; Tab 6, pp. 1161-1163) On June 23, 1998, WWE signed a licensing agreement with THQ/Jakks, effective as of June 10, 1998. (Tab 5, ¶ 23; Tab 18)

### Formation of Bell Consulting

On or about March 8, 1998, while acting as WWE's Senior Vice-President of Licensing and Merchandise, and without WWE's knowledge, consent or prior approval, Bell formed Bell

Consulting, a for-profit organization, and served as its President. (Tab 4, pp. 140-141, 915-917; Tab 19) Bell formed Bell Consulting shortly after receipt of the initial $20,000 payment of monies originating with Jakks, and there is no dispute that Bell used Bell Consulting as a vehicle to receive and launder subsequent bribes and kickbacks. In violation of the Code of Conduct Agreement, Bell never disclosed to WWE either the formation or existence of Bell Consulting, Bell's role as Bell Consulting's President, or the payment of bribes to Bell Consulting. (Tab 5, ¶ 26)

### Continuation of the Schemes

The bribery and kickback scheme related to the THQ/Jakks videogame license was just the beginning of Bell's and SSAI's illegal conduct. The increased demand for licensing rights to WWE's intellectual property provided Bell with an opportunity to steal from WWE in a variety of ways.

The first level involved Bell referring licensing opportunities to SSAI that Bell should have handled with WWE internal resources. (Tab 6, pp. 1142-1154) Typically, this component of the scheme occurred when potential licensees contacted WWE directly seeking to obtain a WWE intellectual property license. (Tab 6, pp. 1142-1154; Tab 4, p. 918) Rather than handle those deals in-house, as Bell was obligated to do, Bell would refer the potential licensee to Shenker in exchange for 50% of the commissions SSAI would receive once WWE issued the license. (Tab 6, pp. 1142-1154; Tab 4, pp. 368-376, 648-673) The following is a list of known licensees subject to this aspect of the scheme, together with the total monies misappropriated

from WWE as a result of having to pay SSAI 11% on opportunities which, if handled by Bell, would not have generated commission to SSAI:

| LICENSEE | TOTAL PAID |
|---|---|
| Game Day Enterprises | $ 2,085.38 |
| Alliance Publishing (a/k/a Comic Images)[5] | $100,056.15 |
| Bowie Industries (a/k/a Changes) | $109,319.43 |
| Toys R Us | $ 2,278.55 |
| Trau & Loevner Imprinted Sportswear | $263,921.52[8] |
| Chaos Comics | $ 4,595.96 |
| Ocean Atlantic Textiles (a/k/a Wild Oats) | $ 15,179.63 |
| MZ Berger[6] | $ 2,933.34 |
| Ralph Marlin | $ 2,227.68 |
| Kosma Kare International | $ 1,949.38 |
| Carolina Manufacturing | $ 2,863.80 |
| Bev Key | $ 2,277.14 |
| Advanced Sports Concepts | $ 2,435.73 |
| Zippo[7] | $ 5,787.38 |

(Tab 6, pp. 1142-1154; Tab 20; Tab 21; Tab 22, ¶ 3) The total amount paid to SSAI by WWE on the specific licensees listed above is **$517,911.07**.

A second aspect of the scheme for which damages can be quantified involved Bell accepting bribes to advance SSAI's licensing proposals over other competing offers, such as was done with respect to the THQ/Jakks videogame license agreement. (Tab 6, pp. 1130-1132) In exchange for Bell advancing THQ/Jakks over the Acclaim proposal, SSAI agreed to split with

---

[5]      Alan Gordon, President of Comic Images, testified that he initiated the licensing deal between Comic Images and WWE by calling Bell. (Tab 39, pp. 8-11)

[6]      Bell testified that he negotiated the MZ Berger licensing deal. (Tab 4, pp. 22-23)

[7]      Bell testified that he negotiated the Zippo licensing deal. (Tab 4, pp. 13-14)

[8]      The kickbacks of this license followed a slightly different path. Trau & Loevner is a t-shirt licensee. After Bell assigned the Trinity license to SSAI to "administer" in order to create a kickback revenue stream for himself and a 5 ½% revenue stream to SSAI it was not entitled to receive, Bell told SSAI he expected half the commission to advance Trau & Loevner as another t-shirt licensee. (Tab 6, pp. 1142-1154)

Bell the 11% commissions SSAI would receive on the videogame license. (Tab 6, pp. 1130-1132, 2500-2520)  SSAI and Shenker also agreed to and did split with Bell the proceeds from the sale of THQ and Jakks stock SSAI received as a result of the THQ/Jakks videogame license proposal.[9] (Tab 6, pp. 790-791, 813-822, 1083-1084)

To ensure that Bell would receive his split on the THQ/Jakks license agreement in addition to his share of the profits from Shenker's sale of the stock, Bell and SSAI entered into written letter agreements outlining their scheme. (Tab 16)  As a result of Bell's and Shenker's destruction of evidence, only one of these contracts escaped the shredder. (Tab 16; Tab 6, pp. 718-720, 813-822, 943-960)

### Payments to Bell in First Two Aspects of Scheme

Pursuant to the two aforementioned aspects of the conspiracy, SSAI made the following payments to Bell Consulting:

> (a) 10/08/98, $20,000;
> (b) 02/14/99, $5,550.24;
> (c) 02/25/99, $62,682;
> (d) 04/30/99, $3,016.13;
> (e) 05/10/99, $30,505.75;
> (f) 06/01/99, $34,610.03;
> (g) 08/16/99, $3,566.62;
> (h) 09/16/99, $49,896.86;
> (i) 11/30/99, $28,035.03;
> (j) 02/22/00, $95,396.90;
> (k) 03/22/00, $2,666.14;

---

[9]      As part of its compensation, SSAI received stock warrants from THQ and stock options from Jakks when WWE signed the videogame license with THQ/Jakks. (Tab 5, ¶ 24)  SSAI received these warrants and options because WWE received the same as consideration in connection with the signing of the videogame license. (Tab 5, ¶ 25)  Since the warrants and options were paid to WWE as part of the deal, SSAI claimed it had rights to 11% of the warrants and options. (Tab 6, pp. 788-792, 1130-1132)

> (l) 05/15/00, $10,888;
> (m) 06/16/00, $124,454;
> (n) 09/09/00, $84,525.29;
> (o) 11/06/00, $581.34; and
> (p) 12/21/98, $280,616.00.

(Tab 23, Exs. A through O; Tab 11) (Tab 6, pp. 1283-1290; Tab 24; Tab 11)  The total amount paid to Bell from SSAI pursuant to their agreement to split commissions is **$836,990.33**.[10]  Bell did not disclose to anyone at WWE that he was receiving a percentage of SSAI's commissions. (Tab 5, ¶ 30)

The bribe to Bell also included splitting payments from SSAI related to SSAI's sales of THQ and Jakks stock.  (Tab 6, pp. 804-833)  Pursuant to that portion of the bribe, Shenker paid Bell **$121,886** of the profits from the sale of the stock, made up of the following payments from Shenker's personal account at Fleet Bank:

> (a) 09/14/01; $52,948;
>
> (b) 10/12/01, $26,994;
>
> (c) 12/11/01, $26,944; and
>
> (d) 02/28/02, $15,000.

(Tab 25, Exs. A through D; Tab 6, pp. 789-790, 807, 1119-1120 and 1123-1129)

## Calculation of Payments

Bell and SSAI typically split SSAI's wrongfully obtained commissions on the aforementioned schemes within days of the payment to SSAI of its 11% commissions from WWE.  As Senior Vice-President of Licensing and Merchandise, Bell had the responsibility of

---

[10]     This amount includes the payments SSAI made to Bell as a result of the Trinity "assignment," which will be discussed in detail below.

signing off on commission checks cut to SSAI from WWE. (Tab 4, pp. 173-175) Before WWE's accounting department would issue SSAI a commission check, Bell would receive a list of all royalties paid by each licensee with a corresponding amount to be paid to SSAI based on the 11% commission rate subject to Bell's approval. (Tab 4, pp. 174-175) As a result, Bell knew exactly how much SSAI was to be paid on each specific licensee. (Tab 4, p. 175) Their scheme was so brazen that Bell then used this information to prepare invoices directed to SSAI, invoicing SSAI for Bell's split of SSAI's commissions. Again, as a result of Bell's and Shenker's destruction of evidence, WWE has only been able to obtain four of the real Bell Consulting invoices. (Tab 20) The rest of the invoices were destroyed by Bell and Shenker during the invoice switching process that occurred in Shenker's office in the summer of 2001. (Tab 6, pp. 706-718) SSAI, thereafter, would send a check to Bell Consulting totaling fifty percent of the commissions received by SSAI relating to licensees subject to the bribery/kickback schemes. (Tab 6, pp. 1142-1154; Tab 4, pp. 648-673; Tab 23, Exs. A through O)

### The Trinity Wal-Mart Exclusive

A third level of the conspiracy to misappropriate monies from WWE involved Bell and Shenker granting a secret exclusive to Trinity to sell to Wal-Mart. In this aspect of the conspiracy, Bell entered into an agreement with Shenker and SSAI whereby Trinity was granted a secret exclusive right to sell WWE-licensed products to Wal-Mart in exchange for 2% of Trinity's sales of such products to be paid to Shenker and/or SSAI and then split with Bell. (Tab 6, pp. 1310-1311) This agreement was made on March 19, 1998, when Bell and Shenker met

with Robert Goetz ("Goetz"), President of Trinity, at WWE headquarters in Stamford, Connecticut. (Tab 6, pp. 1310-1311, 1164-1165; Tab 26; Tab 27, pp. 58-59, 61-66; Tab 4, pp. 869-874) Shenker and Bell agreed to equally split the payments from Trinity for the secret exclusive on Wal-Mart. (Tab 6, pp. 725-727, 1164-1165 and 1241-1242; Tab 4, pp. 869-874)

As a result of the secret exclusive Wal-Mart scheme, Trinity subsequently made three payments to Shenker and/or SSAI for sales of t-shirts depicting WWE's intellectual property to Wal-Mart: (a) 09/19/98, $4,367.64; (b) 11/12/98, $27,633.68; and (c) 04/27/99, $28,881.68. (Tab 30, Exs. A through D; Tab 6, pp. 493-500) The total amount paid by Trinity to Shenker and SSAI for the secret exclusive on Wal-Mart was **$60,883**. (Tab 30, Exs. A through D)

Proving the old adage that there is no honor among thieves, SSAI split only the third check received from Trinity. (Tab 6, pp. 176-177) As noted above, on the portion of the scheme whereby Bell would get half of the commission paid to SSAI by WWE, Bell knew the amounts SSAI was to be paid by WWE, and, therefore, Bell was able to calculate his percentage of the payments and submit invoices to SSAI. With respect to the Trinity payments, however, the first two payments, dated September 19 and November 12, 1998, were sent directly from Trinity to Shenker's home. (Tab 30, Exs. A through C) As a result, Bell was not aware that Shenker received payment from Trinity on those dates and could not invoice him. The third check from Trinity, however, was originally sent to WWE headquarters by mistake.[11] (Tab 31) Accordingly, Bell was aware that Trinity had made an April payment to SSAI on the secret Wal-

---

[11] The original third check from Trinity, dated April 20, 1998, was sent to WWE by mistake. (Tab 7, ¶ 17) As a result, WWE contacted Trinity regarding the check. (Tab 7, ¶ 18) Trinity informed WWE that the check was issued in error, and that WWE should simply destroy the check. (Tab 7, ¶ 19)

Mart deal and could get his share. (Tab 31; Tab 4, pp. 265-272, 929-931) Sure enough, by check dated May 10, 1999, SSAI paid Bell Consulting **$14,440.84**, exactly 50% to the penny of the third check SSAI received from Trinity. (Tab 6, pp. 176-77; Tab 32)

### "Assignment" of the Trinity License Agreement

A fourth level of the conspiracy involved Bell "assigning" the preexisting Trinity license to SSAI to "administer." By doing so, WWE was deprived of the 11% of royalties paid to it by Trinity, all of which were previously commission free. (Tab 5, ¶ 14) Trinity was a preexisting licensee, on whose license agreement SSAI was not entitled to receive commissions. (Tab 6, pp. 1736-1743; Tab 4, pp. 232-233; Tab 8, Ex. A; Tab 5, ¶ 13) In furtherance of their scheme to defraud WWE, Bell agreed to "assign" the Trinity license agreement to SSAI to administer in exchange for 50% of the monies paid to SSAI as a result. (Tab 6, pp. 1736-1743; Tab 4, pp. 213-214) Bell's position provided him with the ability to make such an assignment. (Tab 5, ¶ 15) In fact, Bell was responsible for informing the accounting and legal department as to the licenses SSAI was to receive commissions on and told those departments that SSAI was to be paid on Trinity. (Tab 33; Tab 5, ¶ 15)

The assignment of the Trinity license created a revenue stream for Shenker and Bell that neither had a right to receive prior to the assignment. (Tab 6, p. 1739) Under oath, Shenker admitted that their brazen theft was a "win-win" situation for both him and Bell. (Tab 6, pp. 1739-1740) Both ended up getting 5 ½% of the royalties paid to WWE by Trinity when neither were entitled to a dime of those royalties. (Tab 6, p. 1739) Again, Bell did not disclose to

anyone at WWE that he assigned the Trinity license to SSAI in exchange for 50% of the commissions SSAI would receive on the Trinity agreement. (Tab 5, ¶ 16)

Pursuant to the Trinity "assignment," WWE paid SSAI **$302,935.99**, which SSAI subsequently split with Bell. (Tab 22, ¶ 4; Tab 6, pp. 1142-1154)

### Extension of the Agency Agreement

On March 26, 1998, unaware of SSAI's and Bell's massive fraud and misconduct set forth above, WWE extended the term of the Agency Agreement for an additional five years, to expire on December 31, 2003. (Tab 5, ¶ 32; Tab 34) At no time prior to, or after this extension, did Bell, Shenker or SSAI disclose to WWE that it had engaged in, and intended to engage in, the aforementioned bribery and kickback schemes. (Tab 5, ¶ 33) Likewise, Bell did not disclose the then ongoing scheme with respect to WWE's selection of a videogame licensee. (Tab 5, ¶ 35) If WWE had been aware of the aforementioned conspiracies between and among the Defendants, SSAI and Shenker, WWE would have: (1) terminated Bell's employment; (2) terminated SSAI's Agency Agreement; and (3) refused to enter into an extension of SSAI's Agency Agreement; and (4) discontinued commission payments to SSAI pursuant to the contract. (Tab 7, ¶ 20)

### Bell's and SSAI's Termination

On March 1, 2000, unaware of Bell's misconduct, WWE entered into a severance agreement with Bell, terminating Bell's employment with WWE for reasons unrelated to the aforementioned misconduct. (Tab 5, ¶ 36; Tab 35) By letter dated June 13, 2000, unaware of SSAI's misconduct, WWE terminated SSAI's Agreement on grounds that WWE had changed its

strategic business direction, pursuant to paragraph 13(a)(iii) of the Agreement.  (Tab 5, ¶ 37; Tab 36)

## SSAI's and Bell's Litigation Misconduct

Bell, SSAI and Shenker conspired not only to defraud WWE, but to conceal their conduct as well.  According to Shenker, in or about the summer of 2001, realizing that the kickback and bribery payments from SSAI to Bell Consulting would be revealed if SSAI produced the actual invoices for the payments pursuant to SSAI's document production obligation, Shenker and Bell met at SSAI's offices to remove the real Bell Consulting invoices contained in SSAI's files and replace those invoices with newly fabricated invoices indicating the payments were for product development.[12]  After their prior perjury became manifest, Bell for his part invoked his Fifth Amendment rights regarding all questions related to the case, including the prior fabrication of evidence.  (Tab 37)  On the fabricated invoices created by Bell, the names of the WWE licensees on whose license agreements SSAI and the Defendants were splitting commissions were removed and replaced with phony "developmental project" descriptions.  (Tab 6, pp. 961-965)

Once the substitution was complete, as part of the conspiracy, both SSAI and the Defendants produced the fabricated invoices to WWE in response to legal process.[13]  In addition to agreeing to produce the phony invoices, the Defendants also agreed to, and did, provide false testimony under oath regarding those invoices.  (Tab 6, pp. 706, 713-716; Tab 4, pp. 807-812)

---

[12]      Tab 6, pp. 706-718, 939, 956-57; Tab 4, pp. 397, 402, 407, 416-417, 423, 424, 427-428, 429, 435-436, 443-444, 450-451, 458, 462-463, 471, 478, 485, 490-491, 498, 505-506, 512, 519, 526, 530-531, 537, 543-544, 549-550, 556-557, 563-564, 569, 576-577, 584-585, 591-592, 603, 609-610, 618-619, 632-633 and 642.
[13]      Tab 6, pp. 710-713; Tab 4, pp. 398, 402-403, 406-408, 416, 424, 428, 435, 443-444, 449-450, 451, 457, 461, 463, 471-472, 478-479, 491, 499, 506, 512-513, 519-520, 526-527, 531, 538, 544, 557-558, 564, 569-570, 577, 585, 592, 603-604, 619, 624-625, 633, and 642-643.

19

Finally, in an effort to ensure that WWE would never learn the truth about the Defendants'

dealings with SSAI and Shenker, Bell destroyed the original invoices Shenker gave to him

during the substitution process in the summer of 2001.  (Tab 6, pp. 717-718; Tab 4, pp. 697-699,

949-950)

## V.   Argument

### A.   WWE is Entitled to Summary Judgment on Count Nine of Its Complaint Because There is No Genuine Issue of Material Fact that Bell is Liable for Breach of Contract.

1. **This Court should grant summary judgment with respect to liability on Count Nine of WWE's Complaint because there is no genuine issue of material fact that Bell entered into a contract with WWE and subsequently breached that contract by engaging in the conduct detailed above.**

Count Nine of WWE's Complaint alleges that Bell breached the Code of Conduct

Agreement.  "The key elements for a breach of contract action are: (1) the formation of an

agreement; (2) performance by one party; (3) breach of the agreement by the other party; and (4)

damages." *Shah v. Cover-It, Inc.*, 2003 WL 21213370 *2, (Conn.Sup.Ct.)[14] The first element is

undisputed, as the Code of Conduct Agreement was a written agreement between WWE and Bell

that specified unacceptable conduct by Bell.  (Tab 3)  The Code of Conduct Agreement clearly

prohibited Bell from: (a) accepting fees, commissions or property in connection with any

transaction on behalf of WWE; (b) accepting or offering unauthorized or illegal payments; (c)

using his position directly or indirectly for personal or financial gain; (d) personally taking

advantage of business opportunities which might be of interest to WWE; and (e) serving as an

---

[14]   Unpublished cases are attached to the Appendix at Tab 38.

officer, director, employee, consultant or promoter of for-profit organizations without WWE's prior approval. (Tab 4, pp. 904-905; Tab 3)

WWE fully performed all of its obligations under the Code of Conduct Agreement. (Tab 7, ¶ 6) WWE provided Bell with an office and staff and compensated him for his services in the form of an annual salary. (Tab 7, ¶ 7) Thus, no dispute exists as to the second element.

The third element has been met as Bell violated each and every provision of the Code of Conduct Agreement quoted above and, as a result, breached the contract with WWE. As the foregoing factual background establishes, and as is proven by checks, Shenker's testimony, and Bell's invocation of the Fifth Amendment, Bell did accept fees, commissions or property in connection with transactions on behalf of WWE; did accept unauthorized or illegal payments; did use his position for financial gain; did divert WWE business opportunities; and did organize and direct Bell Consulting for profit without WWE approval. (*Supra*, pp. 7-14)

Although Bell's acts self-evidently violate each provision of the Code of Conduct Agreement, it must also be noted that the payments from SSAI to Bell mentioned were clearly illegal and constitute bribes pursuant to Connecticut's commercial bribery statutes. Pursuant to Connecticut's commercial bribery statutes, Bell, by receiving such payments, violated Conn. Gen. Stat. § 51a-161a which provides "(a) An employee, agent or fiduciary is guilty of receiving a commercial bribe when, without consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs." There is, therefore, no issue of law as to whether Bell's conduct violated Paragraph (b) of the Code of

Conduct Agreement, which expressly prohibited Bell from "accept[ing] or offer[ing] unauthorized or <u>illegal</u> payments." (emphasis added)

The fourth element for breach of contract has been met as WWE has been damaged.  In reality, WWE paid lucrative compensation to a thief who misused his position to enrich himself at the direct expense of WWE.  At a time when he was to be acting with loyalty to WWE, he was loyal only to the proposition of making crooked money any way he could by his criminal conspiracy with SSAI.  He diverted corporate opportunities to SSAI for personal financial gain, used his position to essentially steal Trinity royalties from WWE, and recommended WWE enter into a videogame license only after obtaining a promise he would split the commission stream and stock profits with SSAI. (*Supra*, pp. 7-14)

Accordingly, this Court should grant summary judgment with respect to liability on Count Nine of WWE's Complaint.

> **2.    This Court should grant summary judgment in the amount of $<u>1,677,558.17</u> with respect to Count Nine of WWE's Complaint because there is no genuine issue of material fact as to the amount of damages suffered by WWE as a result of Bell's breaches of contract.**

The damages on Count Nine are as follows:  (1) $<u>836,990.33</u>, representing monies Bell received from SSAI: (a) in exchange for diverting corporate opportunities to SSAI (*supra*, p. 11); (b) recommending that WWE accept the THQ/Jakks videogame license proposed by SSAI (*supra*, pp. 7-8); and (c) assigning the Trinity license to SSAI (*supra*, pp. 13-14); (2) $<u>14,440.84</u>, representing monies Bell received pursuant to the secret exclusive given to Trinity to sell WWE-licensed products to Wal-Mart in exchange for 2% of Trinity's sales of such products (*supra*, pp. 12-13); (3) $<u>121,886</u>, representing monies Bell accepted from SSAI totaling 50% of Shenker's

profits from the sale of THQ and Jakks stock that SSAI received as a result of WWE entering into a videogame license with THQ/Jakks (*supra*, p. 11); and (4) **$704,241**, representing the amount paid to Bell by WWE after March 19, 1998, conservatively the date on which the first identifiable breach of the Code of Conduct Agreement occurred.[15]   (Tab 22, ¶ 5)  Settled law holds that a principal is entitled to receive any monies paid as commercial bribes to his agent. *Philip Morris, Inc. v. Grinnet Lithographic Co., Inc.*, 67 F.Supp.2d 126 (E.D.N.Y. 1999). Likewise, an employer is entitled to recover all wages paid to a dishonest and unfaithful employee.  *Curiale v. Capolino*, 883 F.Supp. 941 (S.D.N.Y. 1995)

Accordingly, this Court should grant summary judgment with respect to the total amount of damages WWE has suffered related to Count Nine of its Complaint as there is no genuine issue of material fact that WWE suffered **$1,677,558.17** as a result of Bell's breaches of the Code of Conduct Agreement.

**B.**  **WWE is Entitled to Summary Judgment on Counts Five and Six of Its Complaint in the Amount of $5,839,903.02 Because There is No Genuine Issue of Material Fact that Bell and Bell Consulting are Liable for Violations of Connecticut General Statutes § 52-564, Statutory Conversion.**

**1.**  **This Court should grant summary judgment with respect to liability on Counts Five and Six of WWE's Complaint because there is no genuine issue of material fact that Bell and Bell Consulting committed statutory conversion pursuant to Connecticut General Statutes § 52-564 by engaging in the conduct detailed above.**

---

[15]       On March 19, 1998, Bell and Shenker met with Trinity at WWE headquarters and entered into the secret Wal-Mart agreement. (*Supra*, pp. 12-13)  Although WWE has evidence that breaches did occur as early as January 14, 1998 when Bell accepted the first payment in a series of bribes from Shenker and Jakks related to WWE's selection of the videogame license for purposes of this summary judgment motion only, WWE is conservatively selecting the March 19, 1998 date as the Defendants cannot contest that breaches occurred on that date.

Counts Five and Six of WWE's Complaint allege statutory conversion against Bell and Bell Consulting as a result of the bribery and kickback schemes which deprived WWE of royalty revenue. WWE is entitled to a judgment as a matter of law because there is no genuine issue of material fact that Bell and Bell Consulting violated Connecticut General Statutes § 52-564, which provides "Any person who steals property of another, or knowingly receives and conceals stolen property, shall pay the owner treble damages." Connecticut courts have held that money clearly can be subject to conversion. *Omar v. Mezvinsky*, 13 Conn.App. 533, 536 (1988) *cert. denied* 208 Conn. 803 (1988). "Statutory theft under § 52-564 is synonymous with larceny under General Statutes § 53a-119. Pursuant to § 53a-119, a person commits larceny when, with the intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner." *Suarez-Negrete v. Trotta*, 47 Conn.App. 517, 521 (1998) (emphasis added). Statutory theft requires a plaintiff to prove the element of intent to deprive another of his property over and above what he or she must demonstrate to prove conversion.[16] *Id.* A plaintiff must satisfy a higher standard of proof, namely, clear and convincing evidence, in order for the trial court to award treble damages pursuant to § 52-564. *Lepore v. Goldman*, 2003 WL 1995274 (Conn.Sup.Ct.) *quoting Lawson v. Whitey's Frame Shop*, 42 Conn.App. 599, at 605-606.

In sum then, to recover treble damages pursuant to Conn. Gen. Stat. § 52-564 against both Bell and Bell Consulting, WWE must establish that: (1) the money SSAI received and

---

[16]    WWE also alleged counts against Bell and Bell Consulting for common law conversion in its Complaint, however, WWE is only moving for summary judgment on the counts related to statutory conversion as many of the allegations overlap and are duplicative.

subsequently split with Bell through Bell Consulting, rightfully belonged to WWE; (2) Bell and Bell Consulting intentionally deprived WWE of its funds; and (3) Bell's and Bell Consulting's conduct was unauthorized. *See Suarez-Negrete v. Trotta*, 47 Conn.App. at 521. No material issue of fact exists as to whether Bell's conduct was intentional or authorized; it was intentional and not authorized.

By law, all of the payments made to Bell by SSAI are monies rightfully belonging to Bell's employer, WWE. *See Philip Morris, Inc. v. Grinnet Lithographic Co., Inc.*, 67 F.Supp.2d 126, 141 (E.D.N.Y. 1999) (commercial bribes paid to agent belong to principal); *Donemar v. Molloy*, 169 N.E. 610, 611 (N.Y. 1930) (principal entitled to bribes paid to an unfaithful agent); *British American & E. Co. v. Wirth Ltd.*, 592 F.2d 75, 79 (2d.Cir. 1979) (principal entitled to recover any monies paid to agent as commercial bribes). Neither Bell nor any other employee of WWE had any right to monies belonging to the WWE as a result of the exploitation of WWE's intellectual property. (Tab 5, ¶ 18) Bell received **$973,317.17** in bribes and kickbacks from SSAI unquestionably arising out of the exploitation of WWE's intellectual property.[17] This total includes all payments made to Bell on every aspect of the schemes. All of the money was rightfully WWE's money. Trebling this amount produces damages in the amount of **$2,919,951.51**.

Pursuant to a plain reading of the larceny statute, however, WWE is entitled to damages comprised of all monies misappropriated by Bell, "or a third person" in this case – SSAI.

---

[17]    In actuality, the true amount concealed is twice the amount when the Shenker component is added. In the conversion count, we have only included the monies paid to Bell, and cover the Shenker component of the conspiracy to convert WWE's money in the conspiracy count.

Therefore, Bell is liable to WWE not only for the amounts Bell received, but also for the amounts SSAI received pursuant to their schemes.

As noted above, Bell received a total of **$973,317.17** in the form of bribes and kickbacks from SSAI. It is undisputed that the schemes were based on a 50% split of monies. The total amount SSAI received pursuant to the schemes is double Bell's share, or **$1,946,634.34**. The Bell Defendants, therefore, are liable to WWE for **$5,839,903.02** after trebling.

Accordingly, WWE is entitled to summary judgment with respect to liability on Counts Five and Six of its Complaint because there is no genuine issue of material fact that Bell and Bell Consulting intended to, and did, deprive WWE out of over a million dollars in royalty revenue, and such deprivation was unauthorized.

> **2.      This Court should grant summary judgment with respect to the amount of damages related to Counts Five and Six of WWE's Complaint because there is no genuine issue of material fact as to the amount of damages suffered by WWE as a result of Bell's violations of Connecticut General Statutes § 52-564.**

As set forth above, the branches of damages set forth in this count are as follows:

Theory One:

(1)      Treble of entire amounts paid to Bell by SSAI: **$2,919,951.51**; or in the alternative,

Theory Two:

(1)      Treble the entire amount paid to Bell by SSAI in addition to SSAI's share of the schemes: **$5,839,903.02**.

**C.      WWE is Entitled to Summary Judgment on Count One of Its Complaint Because There is No Genuine Issue of Material Fact that Bell Breached the Fiduciary Duties He Owed to WWE.**

     **1.      This Court should grant summary judgment with respect to liability on Count One of WWE's Complaint because there is no genuine issue of material fact that Bell breached the fiduciary duties he owed to WWE.**

Count One of WWE's Complaint alleges breach of fiduciary duties arising from multiple wrongs committed by Bell while in a fiduciary relationship to WWE. WWE is entitled to a judgment as a matter of law because there is no genuine issue of material fact that Bell breached the fiduciary duties he owed to WWE.

     **a.      Bell was a Fiduciary of WWE**

Under Connecticut law, "a fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill and expertise and is under a duty to represent the interest of the other." *Capitol City Personnel v. Harriet Franklin*, CV 910505367 1997 Conn. Super. Lexis 453, * 6-7, (1997) (staffing coordinator of company that provided placement services for health care professionals held to be a fiduciary) *quoting Dunham v. Dunham*, 204 Conn. 303, 322 (1987).   The Connecticut Supreme Court has "specifically refused to define 'a fiduciary relationship in precise detail and in such a manner as to exclude new situations,' choosing instead to leave 'the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other.'" *Alaimo v. Royer*, 188 Conn. 36, 41 (1982) *quoting Harper v. Adametz*, 142 Conn. 218, 225 (1955). *See also* Restatement (Second) Agency, § 1 (1)(1958) (An agency relationship is the "fiduciary relationship which results from the

27

manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."); *Detroit Lions, Inc. v. Argovitz*, 580 F.Supp. 542, 547 (E.D.Mich. 1984) ("The fiduciary relationship arises not only from a formal principal-agent contract, but also from informal relationships of trust.").

   All of the positions held by Bell at WWE were positions of trust and given to him because of his unique expertise in product licensing. (Tab 7, ¶ 10) The Code of Conduct Agreement he signed specifically acknowledged his fiduciary objections, and confirmed that he would not "engage in any activities or have any personal or financial interests which impair, or appear to impair, [his] independence or judgment or otherwise conflict, or appear to conflict with [his] responsibilities to [WWE]." (Tab 4, pp. 903; Tab 3; Tab 7, ¶ 4) As a matter of contract and law, the Code of Conduct Agreement imposed fiduciary duties upon Bell.

   Additionally, as Senior Vice-President of Licensing and Merchandise, Bell was responsible for procuring licenses for WWE, negotiating license agreements between WWE and potential licensees, WWE's performance pursuant to license agreements, and all other activities necessary and/or attendant to the development and maintenance of WWE's licensing program. (Tab 4, pp. 906-907; Tab 5, ¶ 3) Bell's position was a high-level position on WWE's organizational chart. (Tab 4, p. 73; Tab 5, ¶ 5) Further, Bell understood his position to be an important position within the company. (Tab 4, p. 78) Additionally, Bell understood that WWE's CEO, Mrs. Linda McMahon, placed a heightened level of responsibility in Bell. (Tab 4, p. 73-74; Tab 7, ¶ 9) Bell had superior knowledge, skill and expertise in the area of licensing and was under a duty to represent the interests of WWE. (Tab 7, ¶ 10)

### b.    Bell Breached his Fiduciary Duties

As a fiduciary, Bell owed WWE the highest duty of loyalty, honesty and fair dealing. *See Santangelo v. Middlesex Theater, Inc.*, 125 Conn. 572, 577 (1932). Connecticut has adopted the famous standard for the duty owed by a fiduciary as set forth by Justice Benjamin Cardozo. "Many forms of conduct permissible in a workday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." (Internal quotation marks omitted.) *Willow Funding Co. v. Grencom Associates*, 2000 WL 151236 at *17 (Conn.Sup.Ct.) *quoting Meinhard v. Salmon*, 164 N.E. 545 (1928); *Konover Development Corporation v. Zeller*, 228 Conn. 206, 218, fn 9 (1994).

As a fiduciary, Bell could not assume any duties or enter into any transaction concerning the subject matter of his agency in which he has an individual interest or represents interests adverse to those of his principal, unless WWE had full knowledge and gave consent. *Naviera Despina, Inc. v. Cooper Shipping Company, Inc.*, 676 F.Supp 1134, 1142 (S.D.Ala.1987) *citing Amoco Production Co. v. Jacobs*, 746 F.2d 1394, 1400 (10th Cir.1984); *See also Phillips Petroleum Company v. Peterson*, 218 F.2d 926, 934 (10th Cir.1954) *citing Robertson v. Chapman*, 152 U.S. 673, 681-682 (1984); *and* Restatement (Second) Agency §§ 389, 390; *Gussin v. Shockey*, 725 F.Supp. 271, 275-276 (D.Md.1989) (An agent has a "duty not to put himself in a position where his own interests may conflict with the interests of his principal."); *Phoenix Mutual Life Insurance Company v. McLean*, 263, F.Supp. at 254 ("Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in

all matters connected with his agency."); *Barker v. First National Bank of Birmingham*, 20 F.Supp 185, 190 (N.D.Ala.1937) ("Unless otherwise agreed, an agent is subject to a duty to his principal not to act on behalf of an adverse party in a transaction connected with his agency."); *Winget v. Rockwood*, 69 F.2d 326, 330 (8th Cir.1934) (Agent had a duty not to represent an adverse interest, either of himself or a third party, without fully and completely informing his principal of the dual and conflicting relationship).

Aside from these negative prohibitions attendant to the fiduciary relationship, Bell also had affirmative obligations imposed upon him by fiduciary law. Among such duties is the affirmative obligation to disclose the aforementioned secret agreements he had with SSAI and Shenker related to WWE intellectual property licensing. *See Kline v. Pyms Suchman Real Estate Co.*, 303 So. 2d 401, 404 (Fla.Dist.Ct.App.1974) (Duty of loyalty results in legal obligation of agent to inform principal with "fairness, promptness and completeness concerning all facts within his knowledge which are, or may be, material to situation" in connection with the agency.); *Maryland Casualty Co. v. Conner*, 200 F.Supp. 647, 652 (E.D.S.C.1961) ("It is wrong, except where there is full disclosure and consent, for an agent to attempt to serve two masters with differing interests.").

No straight-faced arguments can be made that Bell did not violate all of these elementary requirements of fiduciary law. His self-dealing is manifest. His disloyalty was complete. His dishonesty absolute. To Bell, being a fiduciary was not an opportunity to act with the punctilio of honor, but the vehicle used to satisfy his greed.

30

Accordingly, this Court should grant summary judgment with respect to Count One of
WWE's Complaint because there is no genuine issue of material fact that Bell breached the
fiduciary duties he owed to WWE.

        **2.      This Court should grant summary judgment with respect in the amount of
$6,857,707.12 on Count One of WWE's Complaint because there is no
genuine issue of material fact as to the amount of damages suffered by WWE
as a result of Bell's breach of fiduciary duties.**

The law is pointedly harsh on fiduciaries who violate their duties, and especially harsh on
faithless agents. Connecticut courts and courts throughout the country have routinely required
fiduciaries to disgorge secret profits acquired as a result of a breach of fiduciary duty. *See
Schleifenbaum v. Rundbaken*, 81 Conn. 623 (1909) ("An agent is held to perfect good faith in his
dealing with his principal, and, if he acts adversely to his employer in any part of the transaction
or omits to disclose any interest which would naturally influence his conduct in dealing with the
subject matter of the employment, it amounts to fraud upon the principal as to forfeit any right to
compensation for services."); *see also Bollman v. Loomis*, 41 Conn. 581 (1874) and *Weinhouse
v. Cronin*, 68 Conn. 254 (1896); *Pepe & Hazard v. Jones*, 2002 WL 31319714 (Conn.Sup.Ct.)
(requiring non-fiduciary who used confidential information from a fiduciary with the knowledge
that it was acquired in breach of the fiduciary's duty to the beneficiary to disgorge profits
generated by making use of information communicated by fiduciary); *U.S. v. Miller*, 997 F.2d
1010, 1018 (2nd Cir.1993) ("It is settled law that an agent owes his principal a duty of loyalty,
and must account for any profits realized in connection with his representation of the
principal."); *Clark & Gregory, Inc. v. Hanson*, 225 B.R. 366, 375 (W.D.Mich.1998) *quoting*
Restatement (Second) Agency, § 338 (1958) ('an agent who makes a profit in connection with

31

transactions conducted by him on behalf of the principal is under a duty to give such profit to the principal.'); *see also Eckard Brandes, Inc. v. Riley*, 338 F.3d 1082, 1086 (9th Cir.2003); *U.S. v. Boeing Co.*, 653 F.Supp 1381, 1387 (E.D.Va.1987); *Conklin v. Joseph C. Hofgesang Sand Co., Inc.*, 407 F.Supp. 1090, 1095-1096 (W.D.Ky.1975).

Thus, under the law, Bell must repay all compensation he received from WWE after becoming dishonest. A faithless employee is deemed not to have been entitled to compensation during the period of disloyal service, and that is true whether the compensation was attributable to proper or improper transactions. *See Curiale v. Capolino*, 883 F.Supp. 941 (S.D.N.Y. 1995); *Schleifenbaum v. Rundbaken*, 81 Conn. 623, 623 (1909); *Interpool v. Patterson*, 874 F.Supp. 616, 620 (S.D.N.Y. 1995). Under these principles, WWE is entitled to receive not only the profits received by Bell as a result of the breaches of his fiduciary duties, but also those received by anyone who aided and abetted him. *Id.* Bell is, therefore, liable for the profits received by SSAI arising from his breach of fiduciary duties.

It is equally clear that an employer whose agent has received commercial bribes is entitled to recovery of such bribes. *See Philip Morris, Inc. v. Grinnet Lithographic Co., Inc.*, 67 F.Supp.2d 126, 141 (E.D.N.Y. 1999)

Accordingly, under the law, Bell is liable in damages for violating his fiduciary duties in the following amounts: (1) **$5,970,697.12** paid to SSAI by WWE after the March 19, 1998, (Tab 22, ¶ 6) the date on which both agreed to split kickbacks from the Trinity exclusive (*supra*, pp. 12-13); (2) **$836,990.33**, representing bribes Bell received from SSAI in the form of splitting commission (*supra*, p. 11); (3) **$60,883.00**, kickbacks paid by Trinity to SSAI and Bell pursuant

to the secret exclusive right to sell WWE-licensed products to Wal-Mart in exchange for 2% of Trinity's sales of such products (*supra*, pp. 12-13); (4) **$121,886**, representing bribes Bell accepted from SSAI totaling 50% of Shenker's profits from the sale of THQ and Jakks stock that SSAI received as a result of WWE entering into a videogame license with THQ/Jakks (*supra*, p. 11); and (5) **$704,241**, representing the amount paid to Bell by WWE after March 19, 1998, conservatively the date on which the first identifiable breach of the Code of Conduct Agreement occurred.  (Tab 22, ¶ 5)

The total amount of damages WWE is seeking pursuant to Count One of its Complaint is **$6,857,707.12**.[18]  Accordingly, this Court should grant summary judgment with respect to the amount of damages WWE has suffered related to Count One of WWE's Complaint as there is no genuine issue of material fact that WWE suffered such damages as a result of Bell's breaches of the fiduciary duties he owed to WWE.

**D.    WWE is Entitled to Summary Judgment on Count Two of Its Complaint Because There is No Genuine Issue of Material Fact that Bell is Liable for Fraudulent Misrepresentations.**

    **1.    This Court should grant summary judgment with respect to liability on Count Two of WWE's Complaint because there is no genuine issue of material fact that Bell is liable for fraudulent misrepresentation.**

Count Two of WWE's Complaint alleges fraudulent misrepresentation against Bell as a result of Bell's failure to disclose to WWE the multiple conspiracies Bell entered into with SSAI and Shenker.  In order to establish liability for fraudulent misrepresentation, WWE must establish that Bell failed to disclose to WWE facts known to him, and that Bell had an obligation

---

[18]    Because the $836,990.33 is included in the amount of monies paid to SSAI after March 19, 1998, in order to avoid overstating damages, WWE did not include this amount in the $6,857,707.12 total.

to disclose such facts. *Duska v. Middletown*, 173 Conn. 124, 127 (1977); *Ceferatti v. Boisvert*, 137 Conn. 280, 283 (1950); *Helming v. Kashak*, 122 Conn. 641, 642 (1937). "An action will lie for a fraudulent nondisclosure which causes one to continue in a course of action." *Franchey v. Hannes*, 152 Conn. 372, 378 (1965) *citing Bridge-Mile Shoe Corporation v. Liggett Drug Co.*, 142 Conn. 313, 319 (1955). Furthermore, the "nondisclosure must be by a person intending or expecting thereby to cause a mistake by another to exist or to continue, in order to induce the latter to enter into or refrain from entering into a transaction." *Wedig v. Brinster*, 1 Conn.App. 123, 131 (1983). *See also Pacelli Brothers Transportation, Inc. v. Pacelli*, 189 Conn. 401, 407 (1983) ("The intentional withholding of information for the purpose of inducing action has been regarded . . . as equivalent to a fraudulent misrepresentation.").

It cannot be disputed that Bell knew about his illicit dealings with SSAI. Under the law previously cited, Bell's obligation to disclose those dealings arises out of fiduciary duty law. As a fiduciary of WWE, Bell had a duty to disclose the conduct set forth above, to WWE. *See Kline v. Pyms Suchman Real Estate Co.*, 303 So. 2d at 404 (Duty of loyalty results in legal obligation of agent to inform principal with "fairness, promptness and completeness concerning all facts within his knowledge which are, or may be, material to situation" in connection with the agency.) *See also Pacelli Brothers Transportation, Inc. v. Pacelli*, 189 Conn. at 407 ("It is essential to the validity of a contract between a fiduciary and a beneficiary concerning matters within the scope of that relationship that a full disclosure be made of all relevant facts which the fiduciary knows or should know.").

Bell's motivations for nondisclosure are obvious and not disputed. Simply put, if Bell had disclosed that he and SSAI were crooks, both would have been fired. (Tab 7, ¶ 20) Bell's failure to disclose their misconduct is especially offensive since SSAI's contract was extended literally during the genesis of Bell and SSAI's criminal scheme. (Tab 5, ¶ 32) Instead of disclosing their scheme, Bell wanted SSAI's agreement to be extended in order to perpetrate the criminal scheme and continue to collect on it. As a result, WWE's licensing program was, for years thereto, headed by two world-class crooks who worked every conceivable angle to bilk WWE, and hid their crimes by laundered payments in foreign bank accounts and a multi-layered obstruction of justice thereafter. All of this was necessary because, pursuant to SSAI's agreement, SSAI forfeited all rights to money if it acted dishonestly or fraudulently. (Tab 8, p. 6) If such action were taken against SSAI, there would be no illicit money to split with Bell.

There is no dispute that Bell failed to disclose the aforementioned conduct to WWE. (Tab 4, pp. 874-881, 914-943; Tab 5, ¶¶ 16, 26-31, 33-35) Indeed, to this date he has not come clean. Bell's concealment was of existing facts.

As WWE's Senior Vice-President and fiduciary, Bell's silence and affirmative acts of concealment of the conduct set forth above were fraudulent nondisclosures which not only prevented WWE from terminating Bell's employment but also operated to, and were intended to, induce WWE to continue along the course of paying SSAI commissions that SSAI would not have been entitled to receive had WWE terminated SSAI's Agency Agreement.[19] (Tab 7, ¶ 20)

---

[19] Paragraph 13(a)(iv) of SSAI's Agency Agreement specifically provided WWE with the right to terminate the Agreement and discontinue payment to SSAI: "[I]f [SSAI] engage[d] in any act of fraud, theft deceit [and/or] unethical conduct." (Tab 8, p. 6)

Thus, Bell was able to continue to collect not only his salary from WWE, but also his portion of the kickbacks from SSAI and Shenker. If Bell had disclosed the conspiracies between and among Bell, SSAI and Shenker as he was obligated to do as a fiduciary of WWE, WWE would have: (1) terminated Bell's employment; (2) terminated SSAI's Agency Agreement; (3) refused to enter into an extension of SSAI's Agency Agreement; and (4) discontinued commission payments to SSAI pursuant to the contract. (Tab 7, ¶ 20)  Accordingly, this Court should grant summary judgment on Count Two of WWE's Complaint as there is no genuine issue of material fact that Bell is liable to WWE for fraudulent misrepresentation.

> **2.**   **This Court should grant summary judgment with respect to damages on Count Two of WWE's Complaint in the amount of $6,674,938.12 because there is no genuine issue of material fact as to the amount of damages suffered by WWE as a result of Bell's fraudulent misrepresentations.**

The first component of damages is the **$704,241** paid to Bell by WWE after March 19, 1998, the initial acts of defalcation. All compensation paid an unfaithful agent is recoverable. (Tab 22, ¶ 5; Tab 6, pp. 1310-1311; Tab 27, pp. 58-59) *Curiale v. Capolino*, 883 F.Supp. 941, 950 (S.D.N.Y. 1995) (*citing Musico v. Champion Credit Corp.*, 764 F.2d 102, 112-113 (2d Cir. 1985) *and Interpol Ltd. v. Patterson*, 874 F.Supp. 616, 619-620 (S.D.N.Y. 1995)).

The second component of damages associated with nondisclosure is the amounts paid SSAI after the initial act of defalcation. Had Bell disclosed, WWE would not have renewed SSAI's contract in 1998 and certainly would have terminated it, as it eventually did, once it learned of SSAI's fraud and deceit. (Tab 7, ¶ 20) Having done so, WWE would have been entitled under SSAI's Agency Agreement to make no further payments to SSAI. (Tab 8, p. 6)

Thus, on this component, WWE suffered damages in the amount of **$5,970,697.12**, the total paid to SSAI after March 19, 1998.  (Tab 22, ¶ 6)

The total amount of damages suffered by WWE as a result of Bell's fraudulent misrepresentations is $**6,674,938.12** the total paid to Bell and SSAI after March 19, 1998, conservatively the first identifiable fraudulent nondisclosure by Bell.  Accordingly, this Court should grant summary judgment in the amount of **$6,674,938.12**, because there is no genuine issue of material fact that WWE incurred such in damages as a result of Bell's fraudulent misrepresentations.

**E.      WWE is Entitled to Summary Judgment on Counts Three and Four of Its Complaint Because There is No Genuine Issue of Material Fact that Bell and Bell Consulting are Liable for Civil Conspiracy.**

**1.      This Court should grant summary judgment with respect to liability on Counts Three and Four of WWE's Complaint because there is no genuine issue of material fact that Bell and Bell Consulting are liable for civil conspiracy.**

Counts Three and Four of WWE's Complaint allege civil conspiracy against Bell and Bell Consulting based on the Defendants' agreements with SSAI and Shenker which were designed to, and did, defraud WWE out of millions of dollars in royalty revenue.  WWE is entitled to a judgment as a matter of law because there is no genuine issue of material fact that Bell and Bell Consulting conspired with SSAI and Shenker to defraud WWE out of millions of dollars in royalty revenue.

The elements of a civil action for conspiracy are:  "(1) a combination between two or more persons, (2) to do a criminal or unlawful act or a lawful act by criminal means, (3) an act

done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff." *Governors Grove Condominium Association, Inc. v. Hill Development Corporation*, 36 Conn. Super. 144, 152 (1980) *quoting Williams v. Maislen*, 116 Conn. 433, 437 (1933).

No issue of fact exists on any element of this cause of action. Bell, Bell Consulting, SSAI and Shenker agreed to, and did commit, criminally fraudulent activity aimed at obtaining monies neither were entitled to receive pursuant to their multiple schemes. (*Supra,* pp. 7-14)

No issue of law or fact exists as to whether their actions violated both civil and criminal laws previously cited, including Connecticut commercial bribery statutes.

There are numerous overt acts in furtherance of the conspiracy, including invoicing, laundered payments, license approvals and the like. For reasons previously discussed, WWE also has established that it has been damaged by the conspiracies. (*Supra*, pp. 18, 20-21, 26, 29, 31) Accordingly, this Court should grant summary judgment with respect to liability on Counts Three and Four of its Complaint, as there is no genuine issue of material fact that Bell and Bell Consulting are liable for civil conspiracy.

    **2.**    **This Court should grant summary judgment on Counts Three and Four of WWE's Complaint in the amount of $10,568,206.80 because there is no genuine issue of material fact as to the amount of damages WWE suffered as a result of Bell's and Bell Consulting's conspiracies.**

Both Bell and Bell Consulting are liable for all of the damages suffered by WWE as a result of the conspiracy. "[A]ll conspirators are civilly liable for the damages resulting from any overt act committed by one of them pursuant to the combination." *Governors Grove Condominium Association, Inc. v. Hill Development Corporation*, 36 Conn. Super. 144, at 152.

Conspiracy is an intentional tort, and as such all intentional tortfeasors are held jointly and severally liable for the damages they cause. *Agnes v.* Grem, No. CV 990587276S, 2001 WL 837920, at *7 (Conn. Super. Ct. June 29, 2001) *See also Feen v. Benefit Plan Administers, Inc.*, No. CV 970406726S, 199 WL 33972, at *8 (Conn. Super. Ct. Jan. 13, 1999).

Accordingly, WWE's damages pursuant to Counts Three and Four are calculated in the following manner:

|   | | |
|---|---|---|
| | $5,970,697.12 | Total amount paid to SSAI after March 19, 1998 |
| - | 1,946,634.34 | Total bribes to Bell from SSAI including SSAI's portion on the 50% schemes (in order to prevent overstating WWE's damages, this number must be backed out prior to trebling) |
| = | 4,024,062.78 | |
| + | 5,839,903.02 | (Treble amount of total bribes to Bell from SSAI including SSAI's portion of the 50% schemes) |
| + | 704,241.00 | Total amount paid to Bell by WWE after March 19, 1998 |
| = | **$10,568,206.80** | Total amount due to WWE from Bell and Bell Consulting |

Accordingly, Bell, Bell Consulting, Shenker and SSAI are all jointly and severally liable to WWE for $10,568,206.80.

## VI.    **CONCLUSION**

Based on the foregoing, it is clear that WWE is entitled to summary judgment with respect to liability on the abovementioned Counts contained in WWE's Complaint because there is no genuine issue of material fact that Bell is liable to WWE on each Count.  Additionally, WWE is entitled to summary judgment with respect to its damages relating to the abovementioned Counts because there is no genuine issue of material fact as to the amount of damages WWE suffered as a result of Bell's and Bell Consulting's conduct.

**WHEREFORE**, WWE respectfully requests that this Court grant summary judgment with respect to liability and damages on Counts One, Two, Three, Four, Five, Six and Nine contained in its Complaint.

PLAINTIFF,
WORLD WRESTLING ENTERTAINMENT, INC.

By

Stanley A. Twardy, Jr.
Richard P. Colbert
Day, Berry & Howard LLP
One Canterbury Green
Stamford, Connecticut 06901-2047
Telephone (203) 977-7300
Facsimile (203) 977-7301
Email: rpcolbert@dbh.com
Juris No.: 14230

Jerry S. McDevitt (Pro hac vice)
Amy L. Barrette (Pro hac vice)
Kirkpatrick & Lockhart LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
Telephone:  (412) 355-6500
Facsimile:  (412) 355-6501